**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

<table>
<tr><td>INTERNATIONAL RAIL PARTNERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RAIL PARTNERS, LLC, GULF & ATLANTIC RAILWAYS, LLC, and NEWCO SBS HOLDINGS, LLC,<br><br>Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>C.A. No. 2021-1029-PAF</td></tr>
</table>

**MEMORANDUM OPINION**

Date Submitted: May 16, 2024
Date Decided: March 31, 2025

Andrew S. Dupre, Brian R. Lemon, AKERMAN LLP, Wilmington, Delaware; *Attorneys for Plaintiff International Rail Partners, LLC*.

Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Kevin S. Reed, Nicholas A.S. Hoy, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Defendants American Rail Partners, LLC and Newco SBS Holdings, LLC*.

William M. Lafferty, Kevin M. Coen, Elizabeth A. Mullin Stoffer, Kirk C. Andersen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Geoffrey L. Harrison, SUSMAN GODFREY L.L.P., Houston, Texas; Elisha B. Barron, SUSMAN GODFREY L.L.P., New York, New York; Emily K. Cronin, SUSMAN GODFREY L.L.P., Los Angeles, California; *Attorneys for Defendant Gulf & Atlantic Railways, LLC f/k/a RailUSA, LLC*.

**FIORAVANTI, Vice Chancellor**

The purpose of a settlement is to end litigation. When a settlement involves a mere exchange of money, there is often little to do other than to pay up in accordance with the payment terms. But when a settlement requires future conduct by the parties, especially parties that distrust one another, there is greater risk that a settlement will come off the rails, leading to more litigation over performance of the settlement.

This case falls into the latter category. Two investors formed a business to acquire and operate short line railroads. Distrust and finger-pointing ensued shortly after the business left the station. Litigation followed. In connection with a global settlement that involved the sale of the railroads, the minority investor and its favored bidder were given the right to submit the last bid. The minority investor and its favored bidder were not chosen to buy the railroads. The minority investor claims the majority investor, which controlled the sale process, unfairly favored the winning bidder in violation of the settlement agreement.

In this post-trial opinion, the court finds the majority investor breached the settlement agreement and violated the implied covenant of good faith and fair dealing, but the minority investor did not prove damages. Accordingly, judgment will be entered in favor of the defendants.

## I.    BACKGROUND

These are the facts as the court finds them after trial.[1]

### A.    The Parties

Gary Marino is a former commercial banker who developed an interest in short line railroads more than four decades ago.[2]  Since then, he has acquired and operated a number of railroads through various entities.[3]  One of those entities is the plaintiff in this action, International Rail Partners, LLC ("IRP" or "Plaintiff"), a Delaware limited liability company headquartered in Florida.[4]  In February 2018, Marino approached Oaktree Capital Management, L.P. ("Oaktree"), a global investment firm, to partner with Marino in acquiring the Grenada Railroad, LLC ("Grenada Railroad"), a short line railroad operating between Canton, Mississippi

---

[1] Other factual findings are contained in the analysis of the claims.  Trial exhibits are cited as "JX"; stipulated facts in the pretrial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number.  Citations to testimony at trial are cited in the form "Tr. (X)," with "X" representing the surname of the speaker, if not clear from the text.  When resolving factual disputes, this opinion generally gives more weight to contemporaneous evidence.  *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact."  (alteration in original) (internal quotation marks omitted)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record.  In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] Tr. 317:1–318:6 (Marino).

[3] *Id.* at 317:1–321:7 (Marino).

[4] PTO ¶ 21; Tr. 321:23–322:16 (Marino).

and Memphis, Tennessee.[5] In August 2018, Marino and Oaktree formed Defendant American Rail Partners, LLC ("ARP"), a Delaware limited liability company headquartered in Florida.[6]

ARP was governed by a "board of managers" (the "ARP Board"), and its ownership interests were "designated as stock."[7] Marino held his equity interest in ARP through IRP, and Oaktree held its equity interest through Defendant Newco SBS Holdings, LLC ("SBS," and together with ARP, the "Sellers").[8] Following ARP's formation, Equity Group Investments ("EGI") became a stockholder of SBS.[9] SBS owned all of the preferred stock and a majority of the common stock of ARP.[10]

---

[5] Tr. 322:17–23 (Marino) ("[IRP] had an investment banker by the name of Oppenheimer & Company that introduced us to Oaktree"); *id.* at 597:14–22 (Quick) ("[T]he first transaction in RailUSA . . . was Grenada Railroad. . . . [Marino] hired Oppenheimer to go out and raise capital to fund that acquisition. And Oppenheimer approached us and we were able to agree on terms. So effectively we financed the acquisition."); *see* JX 550 at 30.

[6] PTO ¶ 22; JX 29 at 4; JX 158 at 5.

[7] PTO ¶ 25. This opinion adopts the parties' terminology as used in the pretrial order, which is inconsistent with the ARP limited liability company agreement. The agreement refers to the management structure as a board of directors and the equity as units. *See* JX 29 at 5, 16, 28–29. This inconsistency in labeling is not material to the outcome of this case. *See generally New Enter. Assocs. 14, LP v. Rich*, 295 A.3d 520, 580 (Del. Ch. 2023) ("Using the contractual freedom that the LLC Act confers, the drafters of an LLC agreement can create a manager-managed entity, label the managers a 'board of directors,' refer to the LLC interests as 'shares,' and provide that the LLC will be governed by the DGCL and operate as if it were a Delaware corporation.").

[8] JX 29 at 51; JX 389 at 184:7–8 (Quick Dep.).

[9] Tr. 596:3–7 (Quick); *id.* at 811:19–812:26 (Harwood). EGI is a family office and investment firm of private equity investor Sam Zell. *Id.* at 810:18–23 (Harwood).

[10] PTO ¶ 26.

3

IRP owned the rest of ARP's common stock.[11]  SBS appointed three directors to the ARP Board; IRP appointed the other two directors.[12]  The SBS-appointed directors were Evan Harwood, Rahul Sen, and Aaron Zell.[13]  The IRP-appointed directors were Marino and Bennett Marks.[14]

ARP was a holding company that indirectly held its operating railroad assets through its wholly owned subsidiary, Gulf & Atlantic Railways, LLC f/k/a RailUSA, LLC ("RailUSA").[15]  Simultaneously with ARP's formation in August 2018, ARP, IRP, RailUSA, and SBS entered into a "Management Agreement," pursuant to which IRP would provide management, consulting, and financial services to ARP and its subsidiaries (*i.e.*, its railroad assets).[16]  Later that month, RailUSA acquired Grenada Railroad.[17]  In June 2019, RailUSA acquired the Florida Gulf & Atlantic Railroad, LLC ("FGA"), a railroad that operated between Baldwin, Florida and Pensacola, Florida with a separate line running between Tallahassee, Florida and Attapulgus,

---

[11] JX 29 at 51; PTO ¶ 21.

[12] PTO ¶¶ 26–27.

[13] Tr. 844:2–7 (Harwood).  Harwood, Sen, and Zell are all employees of EGI.  JX 392 at 22:21–23:3 (Harwood Dep.); JX 497 at 1; JX 284 at 1.

[14] JX 29 at 30.

[15] RailUSA is a Delaware limited liability company headquartered in Florida.  JX 443 ¶ 6. In January 2023, RailUSA formally changed its name to Gulf & Atlantic Railways, LLC. PTO ¶ 58.

[16] JX 43 at 104–15; Tr. 235:8–11 (Ventrcek).  JD Ventrcek joined IRP in 2016 and is IRP's current President.  *Id.* at 233:21–234:19 (Ventrcek).

[17] Tr. 235:16–19 (Ventrcek); *id.* at 595:23–596:2, 597:14–16 (Quick).

Georgia.[18]  Both FGA and Grenada Railroad were wholly owned subsidiaries of RailUSA.[19]

## B. RailUSA's Owners' Relationship Deteriorates, and Marino Looks for an Exit.

RailUSA got off to a bumpy start.[20]  In spring of 2019, Marino retained Barbara Wilson as a consulting chief financial officer ("CFO") for RailUSA, a decision that Marino soon came to regret.[21]  RailUSA missed its projections by a wide margin.[22]  SBS, unsurprisingly, blamed IRP and Marino's management style for RailUSA's poor performance, which ultimately led SBS to terminate the Management Agreement with IRP on July 18, 2019.[23]  Marino lamented that the Management Agreement was terminated before he had the chance to terminate

---

[18] Tr. 245:23–246:12 (Ventrcek); JX 24; JX 55 at 19.

[19] PTO ¶ 24.

[20] The parties spill considerable ink sparring over whether external factors or IRP's performance under Marino's management caused RailUSA to underperform.  The finger-pointing over IRP's performance highlights the animosity among the parties and their principals, but that dispute is not one that needs to be resolved in this case.

[21] JX 387 at 14:4–22, 20:7–9 (Wilson Dep.); JX 394 at 272: 4–23 (Marino Dep.) (explaining that Marino had "second thoughts about" hiring Wilson).  Wilson reported to Marino during this time.  JX 387 at 14:23–24 (Wilson Dep.).

[22] IRP projected to Oaktree in June 2018 that it could achieve an adjusted EBITDA of $17.5 million in 2019 for the Grenada Railroad.  JX 25; JX 551 at 5; Tr. 601:2–8 (Quick). In March 2019, IRP revised the projected adjusted EBITDA numbers down to $5.5 million. JX 25; Tr. 601:24–602:3 (Quick).  Ultimately, Grenada Railroad's adjusted EBITDA for 2019 was $2.8 million.  JX 25; Tr. 601:13–15 (Quick).

[23] JX 543; Tr. 597:23–599:7 (Quick).  IRP points to a number of other issues for RailUSA's poor performance, including a government shutdown and bad weather.  *Id.* at 236:9–243:22 (Ventrcek) (discussing RailUSA's performance issues).

5

Wilson.[24] The following month, RailUSA hired Wilson as its President and CFO.[25] Marino's relationship with SBS (*i.e.*, Oaktree and EGI) went downhill from there. As David Quick, Oaktree's managing director who oversaw SBS's investment, mildly put it: "[C]learly, things were not working well as a partnership between IRP and us, EGI and Oaktree."[26]

Marino first sought to end his acrimonious relationship with SBS by purchasing the railroads. He embarked on a strategy that included the financial backing of IIF Acquisitions LLC ("IIF"), an investment fund controlled by J.P. Morgan Investment Management, Inc. ("J.P. Morgan").[27] In the fall of 2019 and again in 2020, IIF and IRP offered to acquire RailUSA from ARP.[28] Both times, SBS determined that the offer was too low, and the discussions broke down.[29]

---

[24] JX 394 at 272:4–23 (Marino Dep.).

[25] JX 387 at 13:15–14:10 (Wilson Dep.).

[26] Tr. 617:10–12 (Quick).

[27] JX 93; Tr. 330:1–15 (Marino); *id.* at 617:3–15 (Quick) ("So as a means to helping solve some of the difficulty, [Marino] thought if J.P. Morgan could come in and buy us out, that would be a means to an end of resolving that."). The parties often refer to IIF and J.P. Morgan interchangeably. *See* Tr. 368:4–6 (Marino).

[28] Tr. 617:3–7, 617:21–618:20 (Quick). IRP and IIF initially began discussions concerning a potential partnership in the short line rail industry in 2019. JX 391 at 41:18–42:9 (Li Dep.). In May 2021, IRP and IIF once again discussed a potential partnership in the short line rail industry, this time specifically to acquire RailUSA. *Id.* at 69:18–70:11 (Li Dep.); Tr. 13:16–14:9, 15:3–10 (Bastone). Paul Bastone is IRP's CFO. *Id.* at 5:20–21 (Bastone).

[29] Tr. 617:16–618:1 (Quick).

SBS took a more aggressive approach with Marino and IRP. In February 2020, ARP and RailUSA filed a complaint against IRP, alleging that IRP mismanaged RailUSA.[30] Not to be outdone, IRP filed counterclaims against ARP and RailUSA and instituted a second suit for advancement (collectively, the "Prior Litigation").[31]

In the spring of 2021, during the pendency of the Prior Litigation, ARP decided to sell RailUSA.[32] IIF and IRP were given an opportunity to bid before ARP

---

[30] PTO ¶ 28; JX 38. The case was originally filed in the Superior Court of the State of Delaware and was later transferred to this court. *See Am. Rail P'rs, LLC v. Int'l Rail P'rs, LLC*, C.A. No. N20C-02-283 EMD CCLD (Del. Super.), Dkts. 1, 24; *Am. Rail P'rs, LLC v. Int'l Rail P'rs, LLC*, C.A. No. 2020-0890-PAF (Del. Ch.).

[31] PTO ¶ 28; *see Int'l Rail P'rs LLC v. Am. Rail P'rs, LLC*, C.A. No. 2020-0177-PAF (Del. Ch.), Dkt. 1; *Am. Rail P'rs, LLC v. Int'l Rail P'rs, LLC*, C.A. No. 2020-0890-PAF (Del. Ch.), Dkt. 7.

[32] JX 391 at 40:9–16 (Li Dep.).

formally put RailUSA on the market.[33]  The negotiations did not progress far, and that failure was partially attributable to the overhanging litigation.[34]

### C. ARP Launches a Formal Sale Process.

In August 2021, ARP commenced a formal process to sell RailUSA (the "Sale Process"), retaining Northborne Partners, LLC ("Northborne") as its financial adviser.[35]  Northborne contacted potential buyers and distributed confidential

---

[33] *Id.* at 39:13–40:6 (Li Dep.); Tr. 618:2–8 (Quick).  During this time, Hai-Gi Li, a managing director at J.P. Morgan, approached Harwood to inquire whether ARP would sell RailUSA directly to IIF.  JX 391 at 26:3–19, 44:14–46:9 (Li Dep.).  IRP was not involved in this discussion.  Harwood told Li that a sale process would be taking place and encouraged IIF to participate.  *Id.* at 45:19–24 (Li Dep.).  Harwood ultimately questioned the seriousness of IIF's interest due to the parties' prior business relationship.  Tr. 820:3–14 (Harwood) ("Our view of IIF at that stage was we didn't know how real they actually were.  Our history, my history with IIF dated back some time, where they had I believe in three different instances tried to partner with IRP and buy RailUSA.  In all three instances, they either -- they either verbally promised one thing and didn't serve up, you know, a term sheet that matched that number, or their term sheet was wrought with contingencies and clawbacks.").

[34] Tr. 618:2–619:2 (Quick).  ARP, IRP, RailUSA, and SBS had hoped to resolve the on-going litigation in connection with the possible sale.  *Id.* at 618:4–8, 618:21–24 (Quick).  Li explained that IIF was concerned about becoming entangled in the on-going litigation.  JX 391 at 51:13–53:17 (Li Dep.) ("But when legal language around litigation and legal language around liability was introduced in the document that -- where IIF, for me, were simply interested in the asset.  When we – when we saw this language that we did not recognize and were uncomfortable with, we asked -- we asked for separate documents -- separate agreements.").

[35] PTO ¶ 29.  Once IRP and Marino got wind of the Sale Process, IRP filed motions for expedition and for entry of a status quo order in the Prior Litigation, which sought to stop the sale process.  *Am. Rail P'rs, LLC v. Int'l Rail P'rs, LLC*, C.A. No. 2020-0890-PAF (Del. Ch.), Dkts. 61–63.  Those motions were mooted when the parties settled the Prior Litigation, the terms and performance of which are now the subject of this action.  *Id.* Dkts. 80–82.

8

information to parties that signed a non-disclosure agreement, including IIF.[36] Northborne set a September 14, 2021 deadline for bidders to submit an initial indication of interest ("IOI").[37] By that time, Marino and SBS were close to resolving the Prior Litigation, paving the way for Marino, through IRP, to assist IIF with bidding on the railroads.

Nine bidders submitted formal IOIs by the September 14 deadline.[38] One of the bidders, Macquarie Infrastructure and Real Assets Inc. ("Macquarie"), submitted a $192.9 million IOI.[39] Macquarie's IOI was on the high end of the bids Northborne had received.[40] Northborne indicated that Macquarie had been actively engaged in the Sale Process and suggested that the Sellers consider advancing and fast-tracking Macquarie's bid.[41] IIF and another bidder informed Northborne that their IOIs would be delivered the next day, and Northborne recommended that ARP advance both of them to the next round before receiving their formal IOIs.[42]

---

[36] PTO ¶ 30. Benjamin Marks was the lead Northborne representative facilitating the Sale Process. *See* JX 59; JX 343.

[37] PTO ¶ 30.

[38] JX 88 at 2; JX 91 at 4, 7.

[39] PTO ¶ 31.

[40] JX 91 at 7.

[41] *Id.* at 5, 7.

[42] *Id.* at 7; JX 391 at 62:23–63:8 (Li Dep.).

SBS and Wilson did not fancy the prospect of Marino having a role in running the railroads with IIF. Even before IIF's bid came in, Wilson, who by then was RailUSA's President and Chief Executive Officer,[43] derided IIF as "a joke," to which Quick "[a]gree[d]."[44] Wilson also remarked that it was "good news to [her]" that IIF had not submitted a bid yet.[45] On September 16, 2021, IIF deadpanned with a $215 million IOI, the highest IOI to date, by far.[46]

### D. Between Bids, IRP Obtains a Unique Right While Settling the Prior Litigation.

On September 16, 2021, the same day IIF submitted its IOI, the parties to the Prior Litigation reached an agreement in principle to settle those actions.[47] The prospect of a final settlement did not ease the animosity among the parties. Despite IIF having submitted the highest IOI by a significant margin, RailUSA and SBS denigrated IIF, which was Marino and IRP's favored buyer. In a September 22, 2021 email about IIF, Quick remarked that "a fool and his money are some party

---

[43] JX 387 at 14:13–15 (Wilson Dep.).

[44] JX 87 at 1.

[45] JX 92 at 1.

[46] JX 93; JX 94; JX95; JX 91 at 7 (identifying $209 million as the highest IOI as of September 14, 2021).

[47] JX 363 at 3–4.

[sic]."[48] A few days later, Quick suggested that IIF's bid was not "real," pointing to the fact that only a few IIF representatives had been present for a recent diligence call.[49] Quick was not alone. RailUSA's management team, and particularly Wilson, were averse to IRP and, by association, IIF.[50]

While the parties to the Prior Litigation were negotiating the terms of their settlement agreement,[51] Macquarie heard from an industry consultant that IIF and Marino might be teaming up to make a bid for RailUSA.[52] This was a surprise to Macquarie, which had been told by Northborne at the outset of the Sale Process that Marino had been ousted from his role managing RailUSA.[53] Henry Blackford, a senior vice president at Macquarie,[54] recounted that his contact said that Marino's

---

[48] JX 109 at 1; *cf.* Tr. 692:4–12 (Quick) ("Q. Sir, during the sale process you referred to Hai-Gi Li of IIF as a fool; correct? A. In a joking email. I used the phrase that my neighbor often used, a fool and his money are some party, as a joke. I wasn't calling him a fool directly. Q. But in your email, the fool referred to [] Li; correct? A. Referred to that J.P. Morgan team.").

[49] JX 118 at 1.

[50] Tr. 695:19–24 (Quick); JX 472 at 18:2–14 (Quick Dep.) ("Q: Are you aware of anyone associated with any of the defendants did not want to sell RailUSA to IRP or J.P. Morgan? A: I believe the management team had a strong preference not to sell to . . . the former managers . . . Q: When you say the management team, who are you referring to? A: Barbara Wilson and -- and several other managers in the line including Trevor who ran the [Grenada] Railroad.").

[51] JX 102; JX 113; JX 134; JX 142.

[52] JX 122 at 1.

[53] JX 57 at 1.

[54] JX 245 at 12.

11

involvement with a potential buyer was "especially surprising given the relationship" and "ongoing litigation."[55] Blackford stated that "[he's] not entirely sure what to make of that" and that it "seem[ed] to [him] that would be very messy."[56]

On October 4, 2021, Northborne sent a letter to the remaining bidders in the Sale Process, including IIF and Macquarie, outlining the process for preparing final offers (the "Process Letter").[57] The Process Letter stated that each bidder's "Final Offer should represent [its] best and final offer" and cautioned that bidders "should not assume that [they] will be given the opportunity to rebid or revise the terms of or increase the amount of [their] Final Offer."[58] The Process Letter also reserved the right for RailUSA "to modify the process outlined above in any manner without notice and to terminate discussions at any time," and established a deadline to submit final offers by 12:00 p.m. Eastern Time on November 9, 2021.[59]

---

[55] JX 122 at 1.

[56] *Id.*

[57] PTO ¶ 33; JX 126; JX 127.

[58] JX 126 at 2; JX 127 at 2.

[59] JX 126 at 2–3; JX 127 at 2–3.

On October 13, 2021, ARP, IRP, RailUSA, and SBS executed a final settlement agreement to resolve the Prior Litigation (the "Settlement Agreement").[60] Contemporaneously, the parties executed a side letter to the Settlement Agreement providing IIF and IRP with certain rights in the Sale Process (the "Side Letter").[61] In the Settlement Agreement and the Side Letter, the parties made commitments about their conduct in the then-ongoing Sale Process. The Settlement Agreement provided, in pertinent part:

> **Current Sale Process.** The Parties understand that the ARP Board has decided to cause ARP to sell RailUSA and/or its Subsidiaries and has initiated an auction process to facilitate the sale (the "Current Sale Process").
>
> (a) The ARP Parties agree to use commercially reasonable efforts to complete the Current Sale Process and to consummate a sale.
>
> (b) The IRP Parties agree to use commercially reasonable efforts to ensure they do not hinder or interfere with the Current Sale Process in any way. The Parties agree that the IRP Parties are not hindering or interfering with the Current Sale Process by working with IIF Acquisitions LLC on the buy-side therein, as is described more fully in this Section 3.
>
> (c) The ARP Parties consent to the IRP Parties aiding IIF Acquisitions LLC in the Current Sale Process, and waive

---

[60] PTO ¶ 34; JX 140 ("Settlement Agreement"). On October 15, 2021, the parties filed stipulations of dismissal in the Prior Litigation. PTO ¶ 35; *see Int'l Rail P'rs LLC v. Am. Rail P'rs, LLC*, C.A. No. 2020-0177-PAF (Del. Ch.), Dkt. 75; *Am. Rail P'rs, LLC v. Int'l Rail P'rs, LLC*, C.A. No. 2020-0890-PAF (Del. Ch.), Dkt. 82.

[61] PTO ¶ 34; JX 141 ("Side Letter").

any objection to the IRP Parties' involvement with IIF Acquisitions LLC in the Current Sale Process.[62]

There are two key terms in the Side Letter that sit at the core of the dispute in this action, which provide that:

> 1. If the final Conforming Bid submitted by IIF Acquisitions LLC is not the highest and best final Conforming Bid submitted within the timing set forth by the Current Sale Process, then IIF Acquisitions LLC shall be informed of the price of the then-highest final Conforming Bid.
>
> 2. IIF Acquisitions LLC shall not be eliminated from the Current Sale Process at any time prior to the receipt of the last bid permitted to be submitted within the Current Sale Process.[63]

### E. Wilson Encourages a Deal with Macquarie, and Sellers Negotiate Terms to Push Macquarie's Bid to the Top.

The day after ARP, IRP, RailUSA, and SBS executed the Settlement Agreement and Side Letter, Wilson joined Blackford and two Macquarie consultants for a site visit to Grenada Railroad, with dinner to follow.[64] After the dinner, Blackford and Wilson met privately. Blackford's objective was unmistakable: extract information that would give Macquarie an edge in the Sale Process. Blackford testified that he asked a broad scope of questions to "validate [his] understanding of who was involved in the process" and obtain information on "how [Macquarie] might potentially be positioned in the field from a valuation

---

[62] Settlement Agreement § 3. Marks resigned from the ARP Board in connection with the Settlement Agreement. PTO ¶ 27; Settlement Agreement § 2.

[63] Side Letter at 1.

[64] JX 475 at 95:25–97:25 (Blackford Dep.); Tr. 468:7–469:5 (Wilson).

perspective."[65] Wilson testified that she merely "confirmed" what Blackford already knew.[66] This testimony, like most of Wilson's testimony throughout this action, is not credible. Other witnesses and contemporaneous documentary evidence revealed that Wilson gave Macquarie game-changing information—as Blackford put it in a post-meeting email to his colleagues: "the full landscape."[67] For example, Wilson not only "provided feedback on whether [Blackford's] assumptions were correct" with direct answers, but she also "provid[ed] general descriptions" and information on different bidders' positioning in the field.[68] Blackford reported to his team that:

- [JP Morgan] is in fact backing [] Marino as "dumb money", and they are the high bid, but there are concerns around them having "contingencies" in the markup to the purchase agreement

- Fortress' high end of the range is the next highest bid, but their low end of the range is below several bidders, and they have not engaged diligence advisors as aggressively

- Then [Macquarie] - clear that we have done the most diligence to date and are being granted more access than any other bidder

- 3i/Regional is also around our level, but does not appear to be "getting it"

- Lastly, G&W,[69] who, however, indicated that they would have some value to move up

---

[65] JX 475 at 98:9–20 (Blackford Dep.).

[66] Tr. 470:7–10, 476:23–477:2 (Wilson).

[67] JX 148 at 1.

[68] JX 475 at 98:9–99:8 (Blackford Dep.).

[69] This is a reference to Genesee & Wyoming ("G&W"), another bidder in the Sale Process. JX 245 at 10.

[Wilson] never gave a specific value and claimed not to know, but said it had to start with a 2. Sounds like [JP Morgan] is ahead by a bit of a margin, but people are wary of their bid. Apparently [Marino] still has a seat on the [ARP] Board (1/4, the other 3 are Oaktree/EGI), which is a complicated situation to say the least.

[Wilson] reiterated that we are clearly the most prepared, and that closing by the end of the year is very important to both Oaktree and EGI, but that we probably need to move up a little.[70]

Upon hearing only a snippet of the "full landscape" that Wilson shared with Blackford, Ryan Ratledge, a consultant for Macquarie, remarked: "Wow. You did well!"[71] And Louis Paul, a managing director at Macquarie,[72] replied: "We have to give [Wilson] cover given what she told you."[73] A particularly important disclosure from this conversation was that "[Marino] still ha[d] a seat on the [ARP] [B]oard," which prompted Macquarie to ask whether any bidders held a right of first refusal.[74]

Macquarie's inquiry set off a flurry of activity that fundamentally changed the Sale Process. When Macquarie initially asked about the right of first refusal, Northborne "assured [Macquarie] there [was] absolutely no ability for the former

---

[70] JX 148 at 1.

[71] JX 143 at 3.

[72] JX 245 at 12.

[73] JX 147 at 6.

[74] *Id.* at 5–6 ("One item I wonder if it's worth chasing down with Ben Marks is whether [] Marino has a ROFR on this. . . . [M]y concern would be the only reason Gary could still have a Board seat is if he owns part of the Company, and whether that ownership affords him a ROFR."); JX 148 at 1 (October 14, 2021 email from Blackford to Paul discussing Marino's current seat on the ARP Board).

16

management team to mess with the sale process in any way" and that "no shareholder ha[d] a pre-emptive right."[75]  Quick had a different perspective and proposed sending the terms of the Settlement Agreement and Side Letter to all of the active bidders in the Sale Process.[76]  By October 21, 2021, Macquarie had full knowledge of the Settlement Agreement and IIF and IRP's preferential rights in the Sale Process.[77]  On October 27, 2021, the ARP Board formed a special committee made up of the three SBS-appointed directors:  Harwood, Sen, and Zell (the "Special Committee").[78]

Now aware of the terms of the Settlement Agreement, Macquarie's investment committee "expressed concern that [Macquarie] may be materially disadvantaged in the auction and should not proceed unless cost recovery could be secured."[79]  Paul issued an ultimatum to Sellers, via Northborne, on October 27, 2021:  "[Macquarie] will need to go pens down . . . today unless we can agree on the commercial terms of a cost recovery."[80]  Paul proposed a $2.5 million expense reimbursement, but only in the event IIF and Marino were the winning bidder and

---

[75] JX 158 at 1.

[76] JX 159.

[77] JX 169 at 2.

[78] PTO ¶ 36.

[79] JX 169 at 2.

[80] JX 183 at 1.

Macquarie submitted a final offer higher than its IOI.[81]  Paul cleverly justified the demand to Sellers by recounting what they had previously represented to him: "[Macquarie] view[s] this as completely reasonable and, based on what [Macquarie] ha[s] been told, zero cost to your clients because a sale to [Marino] has a probability of 0%."[82]  The Sellers ultimately agreed to Macquarie's request for an expense reimbursement, but Harwood noted to Macquarie that "this is an accommodation that no one else not only required, but even asked for or hinted at," and that "while

---

[81] *Id.*

[82] *Id.*  There is testimony in the record from multiple fact witnesses denying that the Sellers told Macquarie that Marino had a zero percent chance of winning the auction and suggesting that Paul used the language in his October 27 email solely to gain leverage for Macquarie in negotiating an expense reimbursement. Tr. 628:15–629:22 (Quick) ("Q.  Did you ever tell Macquarie that there was a zero percent chance that IIF would win this auction?  A.  No."); *id.* at 823:21–824:15 (Harwood) ("Q.  Did you at any point ever tell [Macquarie] there's a zero percent chance that IIF would win the auction?  A.  No, not that I recall."); *id.* at 727:16–729:23 (Paul) ("Q.  You sent your [October 27] email to Northborne's Ben Marks.  Had he told you that Gary Marino, or the team with which he was bidding from J.P. Morgan, had a zero percent chance of winning?  A.  No one told us any -- that [] Marino had a zero percent chance of winning. . . .  Q.  If no one told you that Marino had a zero percent chance, and if you expected Ben Marks to disagree with what you wrote, why did you phrase your email as you did?  A.  Because I wanted to give him two options, one which was absolutely ridiculous and one that then he couldn't refuse.  And so the comment around the zero percent chance was just so silly, so false that he had to then admit to giving us . . . the cost recovery. . . .  Q.  Was this a false statement, that someone had told you zero percent probability? A.  Absolutely. . . .  [I]t was a negotiating tactic, and it worked the way that I had hoped it would work.").  The court does not find this testimony to be credible, and there are no contemporaneous Macquarie documents in the record that refute the representations made in Paul's October 27 email.

18

I absolutely think you guys would be great partners to the business and its management team, you are not the high bidder at the moment."[83]

On October 29, 2021, Macquarie and RailUSA executed an expense reimbursement letter agreement (the "Expense Reimbursement").[84] The Expense Reimbursement provided that:

> If a Seller Alternative Transaction occurs, then [RailUSA] will reimburse Macquarie in accordance with this letter agreement for all actual and documented out-of-pocket fees and expenses reasonably incurred by Macquarie [during the Sale Process] . . . up to a maximum reimbursement amount payable to Macquarie equal to $2,500,000.00.[85]

The Expense Reimbursement defines "Seller Alternative Transaction" as "a direct or indirect sale to IIF . . . or its affiliate(s) of all or substantially all of the assets or a majority of the equity (whether by merger, other business combination or similar transaction) of [RailUSA]."[86] The Expense Reimbursement was necessary to keep Macquarie in the Sale Process.[87] After the Expense Reimbursement had been

---

[83] JX 193 at 2.

[84] PTO ¶ 37; JX 193 at 4–6.

[85] JX 193 at 4.

[86] *Id.* at 5.

[87] JX 168 at 1–2 (October 20, 2021 text message from Quick to Oaktree representative stating Macquarie is "still super nervous about [Marino] and might walk" but "think we can reassure them"); Tr. 720:3–20 (Paul) (explaining that "the deal team, but certainly the investment committee, thought it wasn't worth us spending time and, indeed, a lot of money on trying to acquire the railroads with that kind of disadvantage. So in order for us to go ahead, we wanted our costs covered to at least cover the costs -- the cost piece of it");

finalized, IIF discovered that the Sellers had uploaded the Settlement Agreement and Side Letter to the data room.[88] The Sellers did not disclose to IIF that the Settlement Agreement and the Side Letter had been shared with the other bidders in the Sale Process.

### F. The "Final" Bids

Three bidders submitted bids by the November 9 deadline provided in the Process Letter: Macquarie, IIF, and G&W.[89] This time, Macquarie's bid was the clear standout, offering $221.8 million in "total consideration," which Northborne identified as an almost $30 million increase in Macquarie's valuation of RailUSA since its IOI.[90] Northborne indicated that Macquarie's "Level of Engagement" had been high throughout the Sale Process.[91] By contrast, IIF's $212 million "base purchase price" bid was $3 million lower than its IOI.[92] Northborne remarked that

---

JX 169 at 3 (memorializing that Macquarie's investment committee "tabled the budget request and in turn requested that the deal team provide additional information on the company's revenue model and clarifications relating to risks and mitigating steps in connection with [] Marino's involvement as a potential bidder before approving additional budget or providing any formal support for the transaction").

[88] *Compare* JX 193 (finalizing the Expense Reimbursement on Friday, October 29, 2021), *with* JX 196 (IIF internal email on Monday, November 1, 2021 flagging "the settlement documents that were updated in the VDR over the weekend" and attaching copies of the Settlement Agreement and Side Letter).

[89] JX 245 at 5.

[90] JX 238 at 3; JX 245 at 5.

[91] JX 245 at 5.

[92] JX 240 at 2; JX 245 at 5.

20

IIF's "Level of Engagement" had improved since the IOI stage and was now on par with that of Macquarie.[93] G&W's "Level of Engagement" had waned since the IOI stage, which was reflected in its latest bid of $180 million.[94]

On November 11, 2021, the Sellers' counsel informed IRP's counsel that "the price of the highest final Conforming Bid received is: $221.8 million."[95] This was the bid submitted by Macquarie.[96] Sellers' counsel did not disclose any information about the Expense Reimbursement.[97] That same day, the Special Committee met and agreed to give G&W "the opportunity to come up on their bid or bow out," but otherwise focused on advancing IIF and Macquarie.[98] The Special Committee's next steps would be keyed off of the timing of IIF's response.[99] If IIF indicated it would respond quickly, the Special Committee would wait for IIF's response before getting back to Macquarie.[100] On the other hand, if IIF indicated it would take a few days to rebid, the Special Committee would "let [Macquarie] know they did not win and there are others that are more competitive on all other terms other than purchase

---

[93] JX 245 at 5.

[94] *Id.* G&W's IOI was between $145 million and $160 million. *Id.*

[95] PTO ¶ 41; JX 255.

[96] PTO ¶¶ 38, 41; JX 238 at 3; JX 245 at 5.

[97] JX 255.

[98] JX 244.

[99] *Id.*

[100] *Id.*

21

price."[101]  Based on this observation, it is apparent to the court that, as of November 11, 2021, the Special Committee viewed IIF's bid as superior to Macquarie's bid in every respect other than its offered purchase price.

IIF responded quickly, submitting a revised bid on November 12, 2021, with a "base purchase price" of $223 million.[102]  There were no other monetary considerations contained in IIF's bid outside of its offered "base purchase price."[103]  The Special Committee met the following day.[104]  Based on the potential closing risks associated with IIF's bid, the Special Committee decided to "keep the other bidders, especially [Macquarie], engaged in the process."[105]  The Special Committee also discussed that Macquarie had conditioned its bid on the assumption that ARP could obtain a new contract with the Canadian National Railway (the "CN Agreement").[106]  The Special Committee expressed uncertainty as to whether ARP could obtain an extension of the CN Agreement on an expedited timeline and satisfy this condition.[107]  The Special Committee decided to provide issues lists to IIF and

---

[101] *Id.* at 2.

[102] JX 262 at 2.

[103] *Id.* at 2–4.

[104] JX 271 at 1.

[105] *Id.*

[106] *Id.*; JX 245 at 8; Tr. 770:12–22 (Paul).

[107] JX 271 at 1.

Macquarie.[108] The issues lists "include[d] a deadline to sign and close," asked the bidders to address "how [they] would treat the management team," and "direct[ed] the bidders to respond to the issues list[s] no later than 12:00 pm CT on November 15."[109]

On November 13, 2021, Wilson called Macquarie at the request of Harwood and Quick.[110] Wilson spoke with Blackford and Paul from Macquarie three separate times that day.[111] Macquarie pressed Wilson to learn what it needed to do to outbid

[108] *Id.*

[109] *Id.* at 1–2; JX 275 at 1.

[110] Tr. 474:9–14 (Wilson).

[111] JX 265 at 1; JX 387 at 162:5–20 (Wilson Dep.); Tr. 474:23–475:9, 475:23–476:17, 478:15–479:7 (Wilson); *see* JX 147 at 13 ("Give [Wilson] a call. Ask her what price we need to win if we drop cp."). There is much dispute as to what was discussed over these three calls between Wilson and the Macquarie representatives. The record contains a number of hand-written notes taken by Blackford. *See* JX 163. Notably, following Wilson's first call with Blackford, Blackford wrote a note stating that Wilson told him, "no one wants to sell to Gary." *Id.* at 8. The record shows that, on these calls with Wilson, the Macquarie representatives were seeking the exact numbers necessary to outbid IIF. JX 475 at 131:4–132:23 (Blackford Dep.). Macquarie confirmed that Wilson did not in fact share the specific $223 million bid number from IIF, nor did she confirm that $223.5 million would outbid IIF. JX 473 at 97:11–21 (Paul Dep.). Following these calls with Wilson, Blackford and Paul gamed out the price they suspected would outbid IIF on their own. JX 163 at 9; JX 473 at 104:16–105:11 (Paul Dep.); JX 475 at 140:2–24 (Blackford Dep.). Macquarie updated its investment committee on November 18, 2021, on its best and final offer of $223.5 million. JX 306 at 5. Had Macquarie definitively known about IIF's $223 million bid, it likely would have included that number in its investment committee presentation, rather than simply stating IIF had improved its bid above Macquarie's previous bid of $221.8 million. JX 307 at 2 (Investment committee presentation providing a "Deal Update" and indicating that the Sale Process "[p]rogressed to Best and Final Offer Round following [IIF] increasing [its] bid above $221.8M," and Macquarie "submitted

IIF. When Wilson reported back to Harwood and Quick between the calls, Quick cautioned her that the Sellers had "a confidentiality provision on [IIF's] bid to not disclose"; Harwood stated that "[Macquarie] just ha[s] to increase [its] bid and improve on [its] other stuff."[112] Wilson discussed the CN Agreement with Macquarie and encouraged Macquarie to submit its best bid.[113] Wilson then informed Harwood and Quick that the "[m]essage [was] delivered."[114] Although Wilson provided Macquarie with significant information, there is no direct evidence in the record that Wilson disclosed the top line number of IIF's bid.

## G.    The "Best and Final" Bids

On November 15, 2021, Macquarie submitted a final bid of $223.5 million, a mere $500,000 above IIF's November 12 bid.[115] Macquarie's bid removed the condition of the CN Agreement and allowed the Sellers to keep payouts of up to $1.3 million from an R&W insurance policy that were expected to be received after

---

Best and Final Offer November 15th at $223.5 million"); JX 306 at 5 (Paul discussing presentation at investment committee meeting and stating that "following [IIF] increasing its bid above US$221.8 million, [Macquarie] subsequently submitted a [best and final offer] of US$223.5 million").

[112] JX 267 at 1–2. The record shows that Wilson did not disclose the price of IIF's active $223 million bid, although she disclosed IIF's "stale" bids. Tr. 528:14–24 (Wilson); JX 471 at 64:16–21 (Wilson Dep.).

[113] Tr. 478:15–479:7 (Wilson).

[114] *Id.* at 479:7 (Wilson); JX 267 at 2.

[115] PTO ¶¶ 42, 44; JX 289.

closing (the "Insurance Claim").[116] The bid also indicated that Macquarie intended to "retain [Company] management and the workforce more broadly" for at least six months post-closing and to "implement an incentive compensation program."[117] Subsequently, the Sellers' counsel informed IRP's counsel that IIF's November 12 bid of $223 million was no longer the "highest and best final conforming bid submitted."[118] Sellers requested an updated bid from IIF within 24 hours and informed IRP that the Special Committee would then review the best and final bids on a holistic basis.[119] When the Sellers disclosed "the price of current highest final Conforming Bid" to IRP, they did not include information about the Sellers' treatment of the $2.5 million Expense Reimbursement or the proceeds from the $1.3 million Insurance Claim.[120]

The Special Committee met on the evening of November 15.[121] Northborne informed the Special Committee of Macquarie's $223.5 million bid.[122] The Special Committee reviewed both IIF's and Macquarie's responses to the November 12

---

[116] JX 289 at 3, 9; *see* JX 290 at 2 (identifying the value of the Insurance Claim as up to $1.3 million).

[117] JX 289 at 3.

[118] PTO ¶ 46; JX 282.

[119] JX 282.

[120] *Id.*

[121] PTO ¶ 45; JX 283 at 1.

[122] JX 283 at 1.

issues lists[123] and raised concerns over closing timelines, specifically IIF's indication that additional due diligence might be necessary.[124] The meeting minutes indicate that the Special Committee suspected that Marino might introduce last minute issues which could jeopardize closing with IIF.[125] After discussion, the Special Committee did not make a final decision as to a winning bid; rather, the Special Committee decided to wait and see if IIF would submit a higher bid and to ask both IIF and Macquarie clarifying questions about their respective proposals.[126]

On November 16, 2021, IIF submitted a revised topping bid of $224 million.[127] This was the final bid of the auction.[128] The Special Committee met that evening to consider IIF's and Macquarie's best and final bids, discussing a "detailed comparison of the economic terms" and other material considerations, such as the ability to "choose a buyer soon and sign quickly."[129] In comparing the economic terms of the two bids, the Special Committee valued IIF's bid at approximately $2.6 million less than Macquarie's bid.[130] That estimate was a result

---

[123] *Id.*

[124] *Id.* at 1–2.

[125] *Id.*

[126] *Id.*

[127] PTO ¶ 47; JX 296 at 2.

[128] Tr. 615:1–10 (Quick).

[129] PTO ¶ 48; JX 294 at 1–2.

[130] JX 290 at 2.

of the Special Committee subtracting the $2.5 million Expense Reimbursement from IIF's base purchase price and adding the $1.3 million Insurance Claim as "[o]ther [c]onsideration" to Macquarie's base purchase price.[131] The Special Committee again raised concerns over IIF's ability to close, potential last minute issues from Marino, and the possibility of employee departures.[132] As explained later in this opinion, the threat of mass employee departures was overblown and misinformed. At the end of the meeting, the Special Committee unanimously agreed that, under a holistic assessment, Macquarie's bid was stronger than IIF's bid.[133] The Special Committee directed Northborne "to move expeditiously to sign a contract with [Macquarie] if certain final changes could be obtained."[134] The Special Committee also instructed Northborne to simultaneously seek additional follow-up information from IIF in the event that Macquarie did not agree to execute on acceptable terms or an acceptable timeline.[135]

---

[131] *Id.*

[132] JX 294 at 2 ("[T]he Special Committee members again raised the possibility that several employees could quit if IIF was the bidder. One of the participants noted that one employee had already quit earlier in the year for this very reason . . . and they had been told by Barbara Wilson that other employees would likely quit as well."); Tr. 484:6–16 (Wilson).

[133] JX 294 at 2.

[134] *Id.* (requesting that Macquarie agree to "(i) provide further clarity and certainty on the purchase price allocation, (ii) remove accrued bonuses from indebtedness, (iii) remove the environmental indemnification and (iv) . . . honor director indemnification obligations of the Company following Closing").

[135] *Id.*

On a November 18, 2021 call with Wilson, IIF insisted that they discuss management plans.[136] What transpired is hotly disputed. Wilson surmised from this call that three of RailUSA's most senior female executives would be fired if IIF became the ultimate purchaser.[137] IIF denies that version of the call.[138] Wilson also suspected that IIF might require further due diligence, even though IIF's final bid was delivered with no "diligence outs."[139]

On November 19, 2021, the Special Committee met and received an update from Northborne on Wilson's discussion with IIF about IIF's management plans for RailUSA.[140] Quick proposed that IIF agree to fund a $5 million management retention plan for RailUSA if IIF were the prevailing bidder.[141] The Special

---

[136] JX 305 at 1.

[137] Tr. 482:7–21 (Wilson).

[138] *See* JX 308 (November 18, 2021 email from Li to Marks from Northborne stating that IIF's plan is "to ask the corporate management team to stay on for a transition period no shorter than [three] months" and "to discuss with each team member their plans and . . . explore longer term employment opportunities individually"); JX 341 (November 22, 2021 email from Li to Marks stating "Never once did I suggest to [Wilson] that any roles would be terminated"); *see also* Tr. 559:1–25 (Li).

[139] JX 277 at 10; Tr. 481:11–17 (Wilson); JX 302 at 1.

[140] PTO ¶ 48; JX 320 at 1 ("[Northborne] said it was [] Wilson's impression that IIF would terminate the entire management team after three months."). The Special Committee relied on Wilson's reporting and did not separately investigate IIF's management plans. Tr. 854:24–856:16 (Harwood) ("Q. So the special committee relied exclusively on [] Wilson; correct? A. Ms. Wilson was the CEO of the company, and we relied on her. There's no reason for us to doubt anything the CEO of our company would relay to us about her employees.").

[141] JX 320 at 1; JX 315 at 3.

Committee concluded that Macquarie's bid offered better terms than IIF's bid and instructed its advisers to continue to seek improvements from Macquarie while pressing IIF to accept the proposed management retention plan.[142]

Under the proposed management retention plan, seven RailUSA executives would each be paid a specified amount if they ultimately chose to leave RailUSA after a transition period.[143] Quick acknowledged that this was a high starting position, and IIF countered with a significantly lower offer of $550,000 as a "commercially reasonable bonus payment" with a six-month transition period.[144] During these discussions, Northborne encouraged IIF to increase its bid by another $1 million, for a total bid of $225 million.[145] Over the course of the next few days, IIF continued to send diligence requests to Northborne.[146]

Meanwhile, Harwood continued to work with Macquarie to finalize its bid, providing details on the specific terms in need of improvement.[147] Macquarie's attorneys provided an updated draft of the purchase agreement on November 19,

---

[142] JX 320 at 2.

[143] JX 312 at 3; JX 315 at 2; JX 389 at 144:15–145:17 (Quick Dep.).

[144] Tr. 660:4–13 (Quick); JX 350 at 1–2; Tr. 858:20–23 (Harwood) ("Q. Right. And they offered in writing to put $550,000 in escrow for three members of RailUSA's management team as an incentive; correct? A. That's right.").

[145] JX 320 at 2.

[146] *See, e.g.*, JX 334 at 1.

[147] *See, e.g.*, JX 319 at 2 ("My advice would be – we sent you the answer key, of sorts. I would have Sidley follow it."); JX 327.

2021.[148] Paul and Wilson continued to communicate over the following days. In response to a question from Paul asking whether there was "still concern about [Marino]," Wilson confirmed that "[RailUSA] continue[s] to answer questions for both you and [IIF]. Goal is to keep both rolling and get you signed up."[149]

On November 22, 2021, IIF informed Northborne that it expected to deliver another turn of a near-final purchase agreement early the next day, and that IIF can "sign tomorrow if [the Sellers] want."[150] IIF indicated to Northborne that it would be "likely to accept" the Sellers' retention of any payouts from the $1.3 million Insurance Claim, but IIF would not alter its base purchase price from $224 million.[151] IIF further clarified that it would agree to a "'commercially reasonable' retention package for the top three executives . . . to be paid on the [six] month anniversary of the deal."[152]

The Special Committee met in the afternoon on November 22 to discuss IIF's and Macquarie's bids.[153] The Special Committee remarked that the two bids were "relatively comparable economically," but that Macquarie's bid presented less

---

[148] JX 317.

[149] JX 332 at 1; *see* JX 336; JX 337; JX 338.

[150] JX 343.

[151] *Id.*

[152] *Id.*

[153] PTO ¶ 48; JX 346 at 1.

30

execution and closing risk and was still stronger on other material terms, including retention and management issues.[154] In that regard, the minutes of the meeting indicate that "[m]embers of the Special Committee raised concerns that [IIF's] package would not be acceptable to management and would not help with the retention risk between signing and closing that had previously been discussed."[155] The Special Committee ended the meeting with the goal of reaching a final agreement with Macquarie within the next 24 hours.[156]

ARP and RailUSA entered into a purchase agreement with Macquarie on November 23, 2021, for Macquarie to purchase all of ARP's issued and outstanding equity interests in RailUSA.[157] The agreement between Macquarie and the Sellers did not include employment guarantees for management or any other RailUSA employee.[158] On November 24, 2021, the Sellers' counsel informed IRP's counsel that the auction had closed and that ARP had entered into a definitive purchase agreement with a different buyer.[159]

---

[154] JX 346 at 1.

[155] *Id.*

[156] *Id.* at 2.

[157] PTO ¶ 49; JX 349.

[158] JX 349 at 53.

[159] PTO ¶ 50; JX 354.

## H. IIF and IRP Attempt to Negotiate Terms to Govern Their Business Relationship.

In parallel with the Sale Process, IIF and IRP discussed a potential business relationship in the event that IIF prevailed in the auction and ultimately acquired the railroads. Those discussions generally occurred between October 21, 2021, and November 9, 2021, and are memorialized in a draft memorandum of understanding (the "November 2021 MOU").[160] The November 2021 MOU was not signed, though IRP and IIF had agreed on some material terms. These terms included the ownership stake IIF and IRP would respectively hold in the post-closing entity, the structure of the board of directors and Marino's position as an initial board member, and IRP's role in providing management services to the railroads.[161] The November 2021 MOU was expressly non-binding and contingent on "the execution . . . of definitive agreements" and "final investment committee and board approval for IIF."[162]

---

[160] Tr. 17:10–18:6 (Bastone); JX 237. The November 2021 MOU is a redline from an earlier draft. JX 237.

[161] JX 237 at 2–4; Tr. 270:12–20 (Ventrcek) ("Q. During the [S]ale[] Process . . . IRP did not have any sort of commitment from IIF because we don't have a signed MOU; right? A. We did not have a signed MOU, correct. Q. And IRP did not have any sort of commitment from IIF; right? A. Had a verbal agreement. A verbal agreement."); *id.* at 25:20–26:2 (Bastone) ("Q. And so as of November 9, 2021, where did you understand things stood between IIF and IRP? A. We were -- we were done. We had agreed to key commercial terms. We had what we considered a verbal agreement, a handshake agreement. We were done. The partnership was -- on both sides, we were ready to move forward with this partnership.").

[162] JX 237 at 2; Tr. 565:17–566:16 (Li).

## I.     Procedural History

On November 24, 2021, Plaintiff initiated this action against RailUSA and the Sellers (collectively, the "Defendants") alleging breach of contract and breach of the implied covenant of good faith and fair dealing.[163]  With its complaint, Plaintiff also filed motions for expedited proceedings and for a temporary restraining order to block the sale of RailUSA to Macquarie.[164]  The court denied Plaintiff's motion for a temporary restraining order on November 30, 2021,[165] and granted Plaintiff's motion for expedited proceedings on December 2, 2021.[166]

On January 23, 2022, Plaintiff filed a motion for a preliminary injunction, again asking the court to block the sale of RailUSA to Macquarie.[167]  On February 22, 2022, the court denied Plaintiff's motion for a preliminary injunction.[168]  In denying Plaintiff's motion, the court concluded, based on the current record, that IRP had demonstrated a reasonable probability of success on the merits of its breach of contract claim, but IRP had not established a sufficient threat of irreparable harm because IRP's alleged harm could, in large part, be remedied by money damages.[169]

---

[163] Dkt. 1.

[164] Dkts. 2–3.

[165] Dkt. 21.

[166] Dkt. 27.

[167] Dkt. 134.

[168] Dkt. 170.

[169] Dkt. 182 at 27:8–11, 31:14–34:2.

The court observed that IRP's alleged harm resulting from the loss of its business prospects arising from the November 2021 MOU seemed "speculative" and subject to "numerous conditions" being met, including that "IIF and IRP would need to finalize their non-binding, tentative conditional MOU that was contingent upon IIF's acquiring RailUSA," IIF "would need to win the auction for RailUSA," and "IIF and the defendants would have to agree on a final set of terms and close the transaction."[170] The court further observed that IIF is not a party to this action.[171]

Eight days later, on March 2, 2022, Plaintiff filed a second motion for a temporary restraining order, along with a motion for expedited proceedings, asking the court to enjoin Defendants from distributing $45 million out of the total proceeds received from the RailUSA sale.[172] Following expedited briefing, the court denied both motions on March 10, 2022.[173]

The next day, Plaintiff and IIF executed a memorandum of understanding documenting the terms of their business relationship (the "March 2022 MOU").[174] As explained later in this opinion, the terms of the March 2022 MOU differed

---

[170] *Id.* at 29:22–30:15 (internal quotation marks omitted).

[171] *Id.* at 30:19–20.

[172] Dkts. 176–77.

[173] Dkts. 185–86, 192–93.

[174] PTO ¶ 53; JX 405 at 6.

34

materially from those in the unsigned November 2021 MOU.[175]  Not long thereafter,

Plaintiff filed an amended complaint,[176] and IIF moved to intervene.[177]  The court

granted IIF's motion to intervene on April 4, 2022,[178] and IIF filed its complaint

against Defendants on April 6, 2022, asserting claims for (i) breach of the non-

disclosure agreement IIF entered into at the start of the Sale Process, (ii) breach of

the Settlement Agreement, and (iii) breach of the implied covenant of good faith and

fair dealing.[179]

On June 1, 2022, Defendants filed motions to dismiss both complaints.[180]

After the motions were briefed but prior to the court holding oral argument, IIF

entered into a confidential settlement and agreed to dismiss its claims with

---

[175] For example, the March 2022 MOU provides that "IRP will be entitled to invest up to $5 million of new cash equity capital for up to a 2.2% ownership interest" as part of the ownership structure, and adds two EBITDA initiatives.  JX 405 at 1, 7; Tr. 56:18–57:12 (Bastone).  The March 2022 MOU also contains a Delaware governing law provision, while the November 2021 MOU contains a New York governing law provision. *Compare* JX 237 at 7 (New York law), *with* JX 405 at 6 (Delaware law); Tr. 56:11–13 (Bastone).

[176] Dkt. 199.

[177] Dkt. 204.

[178] Dkt. 209.

[179] Dkt. 211.

[180] Dkts. 228–31.

prejudice.[181]  On February 27, 2023, the court denied Defendants' motions to dismiss IRP's complaint,[182] and IRP pursued its claims through trial.[183]

## II.  ANALYSIS

The parties dispute whether the Sellers accurately disclosed the "price" of Macquarie's bid in accordance with their obligations under the Side Letter.  Sellers contend that they were only required to disclose the "headline" dollar amount of Macquarie's bid; Plaintiff contends that the Sellers were required to disclose and account for the value credited to Macquarie's bid based on avoiding the Expense Reimbursement and the Sellers retaining the proceeds from the Insurance Claim. The parties also dispute whether the Sellers were permitted to accept a second final bid from Macquarie after IIF had submitted its first topping bid.  Lastly, the parties dispute whether the Sellers were required to treat Plaintiff "fairly" in the Sale Process, and whether their purported failure to do so constituted a breach of the implied covenant of good faith and fair dealing.

### A.  Breach of Contract

To prevail on its breach of contract claim, Plaintiff must establish by a preponderance of the evidence:  "(i) a contractual obligation, (ii) a breach of that

---

[181] Dkt. 281.

[182] Dkts. 303–04

[183] Dkt. 454.

obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at \*47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). The parties agree that the Settlement Agreement and Side Letter are valid contracts and that they executed both agreements.[184] The issues for the court revolve around the second and third elements of the Plaintiff's claim.

Plaintiff requests that the court find the Sellers breached the Settlement Agreement by (1) failing to disclose the financial impact of the Expense Reimbursement and the Insurance Claim that the Sellers credited towards Macquarie's bid, and (2) accepting a second final bid from Macquarie after IIF had submitted its first topping bid.

"The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Delaware courts "adhere[] to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted). The court must read the contract "as a

---

[184] PTO ¶ 34.

37

whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021).

If the contractual language is clear, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted). Contractual language is clear "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

If a contract's language is ambiguous, then the court must look to other sources to determine what an objectively reasonable third party would have understood the parties' intent to be. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196. Nor is a contract unambiguous simply because both sides contend that its meaning is plain. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019) (explaining that "whether a contract is unambiguous is a question of law; this Court cannot find an

38

ambiguous contract unambiguous because each party interprets the contract differently to find it unambiguous").

Instead, ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "The determination of ambiguity lies within the sole province of the court." *Osborn*, 991 A.2d at 1160. "[T]he introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts"; rather, "the extrinsic evidence may render an ambiguous contract clear so that an 'objectively reasonable party in the position of either bargainer would have understood the nature of the contractual rights and duties to be.'" *United Rentals*, 937 A.2d at 835 (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)).

### 1. RailUSA did not owe obligations under the Side Letter.

A threshold question is which among the several Defendants had contractual obligations under the Settlement Agreement and Side Letter that are alleged to have been breached. RailUSA argues it "did not owe obligations under the Side Letter, and did not breach obligations it did not have."[185]

---

[185] RailUSA's Answering Br. 4.

## a.     The plain language of the Side Letter is ambiguous.

The court starts with the plain language of the Side Letter, which provides that:

> The undersigned desire to enter into this letter agreement and hereby agree as follows: [] If the final Conforming Bid submitted by IIF [] is not the highest and best final Conforming Bid submitted within the timing set forth by the Current Sale Process, then IIF [] shall be informed of the price of the then-highest final Conforming Bid.[186]

It is undisputed that RailUSA is one of the "undersigned" signatories.[187]  "As a matter of ordinary course, parties who sign contracts and other binding documents . . . are bound by the obligations that those documents contain."  *Off. Comm. of Unsec. Creds. of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A.*, 103 A.3d 1010, 1015 (Del. 2014).  However, not all signatories are automatically bound to every obligation within a contract.  *See, e.g.*, *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *13 (Del. Ch. Jan. 4, 2022) (concluding, at the pleadings stage, that a signatory did not have an obligation to reimburse the plaintiff where contract provision plainly provided that a different entity owed the reimbursement obligation and dismissing breach of contract claim against signatory), *aff'd sub nom. Mobile Invs., LLC v. Tygon Peak Cap. Mgmt., LLC*, 315 A.3d 445 (Del. 2024) (TABLE).

---

[186] Side Letter at 1.

[187] *Id.* at 3.

RailUSA contends that it "had a materially different position and played a materially different role than the Sellers . . . in the [P]rior [L]itigation, . . . in the settlement negotiations, and . . . in the Sale Process."[188] In short, RailUSA insists that it was the entity being sold, but was not a party involved in the "Current Sale Process."

The Side Letter is drafted in the passive voice and does not specify which of the signatories holds the obligation to inform IIF of the "price of the then-highest final Conforming Bid." The surrounding language in the Side Letter does not aid the court's analysis, either. *Cf. DG BF, LLC v. Ray*, 2021 WL 776742, at *12–13 (Del. Ch. Mar. 1, 2021) (concluding that provisions in an operating agreement mandating that board meetings "shall be held," drafted in passive voice, placed the obligation on the board, not the individual directors, because the operating agreement delegated the "full and entire management of [its] business and affairs" to the board).

The Side Letter does, however, make reference to the "Current Sale Process," which is governed by the Process Letter. The Process Letter provides, in pertinent part:

> RailUSA expressly reserves the right in its sole and absolute discretion to (i) evaluate the terms and conditions of any offers; (ii) reject any or all offers without assigning any reasons; (iii) negotiate with one or more

---

[188] RailUSA's Answering Br. 3.

prospective buyers; (iv) terminate at any time further participation in the process by any party; and (v) enter into a definitive Purchase Agreement, and in each of the foregoing cases, at any time without prior notice to other prospective buyers.[189]

The Process Letter unambiguously articulates RailUSA's "absolute" discretionary authority over the Sale Process. Further, the Settlement Agreement defines RailUSA as one of the "ARP Parties" that "agree[s] to use commercially reasonable efforts to complete the Current Sale Process and to consummate a sale."[190] The plain language of the Settlement Agreement imposes obligations on RailUSA in the Sale Process.

One reasonable reading of the Process Letter, the Settlement Agreement, and the Side Letter, considered together, is that RailUSA had certain rights and obligations with respect to the Sale Process. Because the Side Letter is drafted in the passive voice and does not identify an obligor, it is ambiguous with respect to who owes the obligations thereunder.

### b. The extrinsic evidence demonstrates that RailUSA did not owe obligations under the Side Letter.

The extrinsic evidence indicates that the parties did not intend to impose obligations on RailUSA under the Side Letter. During negotiations, the parties contemplated that the Sellers would be providing the Plaintiff with its rights under the Side Letter. For example, in an October 1, 2021 email concerning the settlement

---

[189] JX 126 at 3–4.

[190] Settlement Agreement at 2.

42

of the Prior Litigation, IRP's counsel stated that "*ARP* can provide IRP/[JP Morgan] the right to make a final topping bid after all the auction information is set in stone."[191]  In an October 13, 2021 letter, IRP's counsel again confirmed that "*ARP* will provide IIF [] the right to make that final bid."[192]  Other emails exchanged between October and November 2021 conspicuously contained the subject line "IRP/ARP/OakTree Settlement" with no reference to RailUSA.[193]  And despite Wilson's general lack of credibility, IRP offered no persuasive contemporaneous evidence to refute her testimony that no one from RailUSA ever spoke to anyone at EGI, IRP, or Oaktree about the terms of the Settlement Agreement and Side Letter until after the documents were executed.[194]

The parties' conduct subsequent to executing the Settlement Agreement and Side Letter further confirms they understood that the Sellers controlled IRP's rights in the Side Letter.  The subject line of the November 11, 2021 email informing IRP's counsel that IIF did not submit the highest bid read "ARP/IRP Letter Agreement."[195]  Similarly, the subject line of the November 15, 2021 email informing IRP's counsel that IIF again did not submit the highest bid read "ARP/IRP – 10/13 Letter

---

[191] JX 546 at 3 (emphasis added).

[192] JX 142 at 11 (emphasis added).

[193] *Id.* at 1–10.

[194] Tr. 458:21–459:10 (Wilson).

[195] JX 255.

Agreement Information."[196] That email also stated that "the *ARP Special Committee* will proceed to assess all bids on a holistic basis."[197] And in a November 13, 2021 email, Marino also recognized that the Sellers controlled the bids.[198]

Based on the extrinsic evidence, the parties had a shared understanding at the time of contracting that RailUSA did not owe any obligations under the Side Letter. The parties' post-contracting conduct confirms this understanding.

### 2. Sellers failed to disclose the "price" of Macquarie's bid.

Plaintiff argues that Sellers breached the Settlement Agreement and Side Letter[199] by failing to accurately disclose the "price" of Macquarie's bid. The resolution of this issue turns on the meaning of the term "price," which is not defined in the Side Letter. Plaintiff contends that the Sellers were required to disclose not only the headline price of Macquarie's bid, but also the value the Sellers credited to Macquarie's avoiding the Expense Reimbursement and the Sellers retaining the proceeds of the Insurance Claim. Sellers contend that they were only required to disclose the specific cash amount of the highest bidder's bid.

---

[196] JX 282.

[197] *Id.* (emphasis added).

[198] JX 270 ("Guys, JPM submitted their topping bid of $223mm to ARP at 7:40pm this evening. Now we wait. Talk soon.").

[199] The Side Letter may well be incorporated into the Settlement Agreement, and the parties often use the terms interchangeably, but the court refers to them separately for clarity.

The parties' respective positions stem from their differing interpretations of the term "price." As used in the Process Letter, "Purchase Price" means "the specific dollar valuation (and not a range) that [a bidder] intend[s] to pay for 100% of the equity interests of [RailUSA]."[200] Plaintiff derives its interpretation of "price" from Delaware case law and dictionary definitions. Under Plaintiff's reading, the term "price" does not simply mean "cash," but instead is essentially equivalent to "consideration"; in other words, Plaintiff contends that "price" refers to all material consideration that a seller receives in a transaction.[201] Sellers, by contrast, contend that the surrounding language in the Side Letter "makes clear that 'price' is defined to mean headline 'Purchase Price,' consistent with the Process Letter."[202]

The court starts with the plain language of the Side Letter. It requires Sellers to "inform[] IIF [] of the price of the then-highest final Conforming Bid" if "the final Conforming Bid submitted by IIF [] is not the highest and best final Conforming Bid submitted within the timing set forth by the Current Sale Process."[203] The Side Letter does not specify that the term "price" refers to the defined term "Purchase Price" as used in the Process Letter. If the parties wanted the term "price" to carry

---

[200] JX 126 at 2.

[201] Pl.'s Opening Br. 30 (quoting *Union Oil Co. of Cal. v. Mobil Pipeline Co.*, 2006 WL 3770834, at *13 (Del. Ch. Dec. 15, 2006)).

[202] Seller Defs.' Answering Br. 31.

[203] Side Letter at 1.

a meaning other than its plain meaning, they knew how to contract to do so. Indeed, they did so elsewhere in the Side Letter.[204] Thus, when a term is undefined, the court customarily turns to a dictionary to discern its meaning. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." (footnote omitted)).

Black's Law Dictionary defines "price" as "[t]he cost of something; the amount of money or other consideration at which something is or is expected to be bought or sold." *Price*, Black's Law Dictionary (12th ed. 2024). Further, and contrary to the Sellers' contentions, this court's decision in *Union Oil Company of California v. Mobil Pipeline Company*, 2006 WL 3770834 (Del. Ch. Dec. 15, 2006), is instructive here. In that case, the holder of a right of first refusal argued that it was only required to match the "price" per share (and not the non-price terms) because the contract referenced only "price," not "price and terms." *Id.* at *13. This court found that the rightholder's position was "based on an overly simplistic reading

---

[204] *Id.* (defining terms "Current Sale Process" and "Conforming Bid").

of the term 'price,' that is not warranted in the context of a transaction between . . . sophisticated business entities." *Id.* This court explained that "among sophisticated business entities, the word 'price' does not simply mean 'cash.' 'Price' is essentially equivalent to 'consideration,' and in the context of the ROFR, it simply refers to all of the material things that the seller will get in the deal—i.e., all of the consideration-related terms." *Id.* (citing *Price*, Black's Law Dictionary (8th ed. 2004)).

Plaintiff contends that the price of Macquarie's bid that the Sellers transmitted to IIF and IRP did not include two elements that should have been disclosed. First is the $1.3 million credit towards Macquarie's bid based on the Sellers retaining proceeds from the Insurance Claim. Sellers argue that, even if "price" encompasses all other consideration, the Insurance Claim proceeds fall under "value," not consideration.[205] Sellers contend that the Insurance Claim proceeds are not "paid by [Macquarie]" and thus do not constitute consideration.[206] Not so. "Delaware courts define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request." *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000). Macquarie's agreement to forgo its contractual right to

---

[205] Seller Defs.' Answering Br. 31 ("'Consideration is a benefit to a promisor or a detriment to a promisee' that the promisor requires as a condition of entering into a contract." (quoting *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1088 (Del. Ch. 2014))); *id.* ("Value, by contrast, encompasses *all* benefits that a party receives from a contract, including those not provided by the counterparty.").

[206] Seller Defs.' Answering Br. 32.

proceeds from the Insurance Claim[207]—a detriment to Macquarie—constitutes "consideration." *See CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080, at *12 (Del. Ch. June 29, 2022) ("Plaintiff's promise to forgo its contractual rights, a detriment to Plaintiff, is valid consideration to support the [agreement]."). Sellers' retention of proceeds from the Insurance Claim was a consideration-related term encompassed by "price."[208] Accordingly, the $1.3 million value Sellers credited to Macquarie's bid based on retaining the proceeds of the Insurance Claim should have been disclosed to Plaintiff as part of the "price," and Sellers' failure to do so constituted a breach of the Side Letter.

*Second*, Plaintiff argues that the $2.5 million Expense Reimbursement should have been included in the "price" that the Sellers disclosed to IIF and IRP. Sellers argue that the Expense Reimbursement is not consideration, but instead is part of the overall value of Macquarie's bid.[209] When evaluated from the standpoint of Macquarie's bid, the Expense Reimbursement was neither a benefit to the Sellers

---

[207] The insurance policy was written for the benefit of RailUSA, meaning any recovery from the policy would presumably flow through RailUSA to its ultimate buyer. JX 389 at 134:18–136:11 (Quick Dep.); JX 387 at 42:10–18 (Wilson Dep.); Tr. 489:17–490:2 (Wilson). The Sellers negotiated to retain the proceeds from any insurance payouts even after a sale closed.

[208] ARP's own summary comparison of the bids added $1.3 million to Macquarie's base purchase price based on the payouts from the Insurance Claim. JX 290 at 2.

[209] ARP's own summary comparison of the bids counted the Expense Reimbursement as negative consideration for IIF's bid. *Id.* (describing bottom line amount as "Estimated Purchase Price + Value of All Other Considerations").

nor a detriment to Macquarie. The Expense Reimbursement would only come into play if Sellers sold RailUSA to IIF. As such, the Expense Reimbursement was not part of the consideration that Macquarie agreed to provide to the Sellers. Instead, the Expense Reimbursement was a penalty counted *against* IIF's bid—it was not affirmatively factored into Macquarie's bid at all. Accordingly, the value Sellers credited to Macquarie's bid based on avoiding the Expense Reimbursement was not encompassed in "price," and Sellers' failure to disclose it did not constitute a breach of the Side Letter.

### 3. IIF submitted the "Final Bid" in the Sale Process.

Plaintiff claims that the Sellers' acceptance of Macquarie's subsequent bid after IIF submitted its November 12, 2021 bid breached the Side Letter.[210] Sellers contend that "nothing in the Side Letter required the Sellers to end the auction on November 12" and that the Sellers were not prohibited from "soliciting bids after IIF made its first topping bid."[211]

The Side Letter mandated that "IIF [] shall not be eliminated from the Current Sale Process at any time prior to the receipt of the last bid permitted to be submitted

---

[210] Pl.'s Opening Br. 32.

[211] Seller Defs.' Answering Br. 35.

within the Current Sale Process."[212] The Process Letter specified that final offers were to be submitted by 12 p.m. Eastern Time on November 9, 2021.[213] On November 9, 2021, Macquarie submitted a bid to purchase RailUSA reflecting a purchase price of $221.8 million, and IIF submitted a bid reflecting a purchase price of $212 million.[214] In accordance with the Side Letter, on November 11, 2021, Sellers' counsel informed IRP's counsel that Macquarie submitted a bid reflecting a purchase price of $221.8 million.[215] IIF submitted a revised bid with a purchase price of $223 million on November 12.[216] On November 15, Macquarie submitted a revised bid with a purchase price of $223.5 million, and Sellers' counsel informed IRP's counsel of the $223.5 million bid that same day.[217] The next day, IIF submitted a further revised bid with a purchase price of $224 million.[218] This was the last bid submitted. On November 23, ARP and RailUSA entered into a purchase

---

[212] Side Letter at 1; *see also* JX 142 at 1 (email confirming the parties' "mutual counsel-to-counsel understanding that [IIF] [had] the right to submit the 'final bid' in the current sale process, after being informed of the other then-highest bid price (if any)").

[213] JX 126 at 2.

[214] PTO ¶¶ 38–39; JX 238; JX 240.

[215] PTO ¶ 41; JX 255.

[216] PTO ¶ 42; JX 262 at 2.

[217] PTO ¶¶ 44, 46; JX 289; JX 282.

[218] PTO ¶ 47; JX 296.

agreement with Macquarie to purchase all of ARP's issued and outstanding equity interests in RailUSA.[219]

It is undisputed that IIF submitted the "final bid" on November 16.[220] But Plaintiff argues that this misses the point. Plaintiff argues that IIF's November 12 bid was the "last bid permitted to be submitted" and should have ended the Sale Process.[221] Plaintiff's position is not supported by the express language of the agreements or the testimony of its own witnesses. Plaintiff's witnesses conceded that nothing in the Side Letter required Sellers to end the auction on November 12 (*i.e.*, after IIF made its first topping bid).[222] Rather, the Process Letter expressly permitted Sellers "to modify the process . . . in any manner without notice and to terminate discussions at any time."[223]

---

[219] PTO ¶ 49; JX 349.

[220] PTO ¶¶ 47–50; JX 296.

[221] Pl.'s Opening Br. 33.

[222] Tr. 371:15–372:4 (Marino) (in response to a question asking where the Side Letter prohibited Sellers from "soliciting bids after IIF made its first topping bid," Marino stated "[i]t doesn't"); *id.* at 48:6–11 (Bastone) ("Q. You said that nothing in the strict verbiage of the side letter requires sellers not to seek further bids after IIF makes an initial topping bid. Correct? A. Yes."); *id.* at 554:8–15 (Li) ("Q. What language in [the Side Letter] prohibited the seller from accepting a bid after IIF had submitted its initial topping bid? . . . A. Yeah, the language doesn't appear to prohibit that."). IRP's witnesses also conceded that Sellers had the right to "decide whether to accept bids after the initial[] deadline" in the Process Letter. *Id.* at 264:7–11 (Ventrcek); *id.* at 552:4–10 (Li) ("[Q.] And now under that reservation and what follows in that paragraph, was it your understanding that the seller had the right to seek additional bids or revised bids after final bids had been submitted? [A.] Based on -- based on my reading of this letter now, yes.").

[223] JX 126 at 3.

51

Plaintiff's position is further undermined when considering the business relationship between the parties and the commercial context of the agreements. *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913–14, 927 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract. . . . The basic business relationship between parties must be understood [for the court] to give sensible life to any contract."). Marino agreed that best-and-final offer rounds are typical,[224] and Sellers' expert confirmed the same.[225] In addition, on November 12, Li asked IIF for "flexibility to improve" IIF's bid up to $225 million "to be competitive,"[226] an acknowledgement that the November 12 bid was not the end of the auction. Macquarie likewise "[e]xpect[ed] a Best-And-Final-Offer . . . round to follow" the November 9 "final round bids."[227]

---

[224] Tr. 361:20–24 (Marino) ("Q. You know from your experience that in an auction . . . sellers will often conduct many rounds of bidding to get to the best price? A. Several rounds.").

[225] JX 481 at 51 (expert report explaining that "sophisticated and experienced bidders such as [Macquarie] and IIF . . . would expect a private M&A sale transaction to proceed through multiple rounds, have changing bid submission deadlines, and have a 'best and final offer' round where the top bidders are able to submit revised best and final bids after the 'final bid' deadline"); *see also* Tr. 690:11–16 (Quick) ("You're submitting in a final bid your first draft of a mark-up to a purchase agreement. That is the first we get to see of it. And it's ordinary for it to take weeks to go from the final bid to actually having this signable document. That is just standard for selling a business.").

[226] JX 254 at 1; Tr. 554:16–556:1 (Li) (explaining the IIF provided authority to increase its $212.8 million bid "in the event [IIF] had to make a second topping bid").

[227] JX 197 at 3.

The plain language of the agreement, supported by the commercial context and the fact that IIF itself continued to engage in the Sale Process after November 12, shows that the Sellers were not required to end the auction after IIF submitted its November 12 topping bid. IIF was entitled simply to submit the "final bid" in the Sale Process, which it did on November 16. Sellers did not breach the Side Letter by holding a best-and-final offer round after November 12.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing

As a fallback argument, IRP relies on the implied covenant of good faith and fair dealing. Specifically, Plaintiff argues that the Sellers "breached the implied covenant of good faith and fair dealing because their conduct frustrated the purpose of the Settlement Agreement and ignored the bargain struck therein."[228]

"The implied covenant is inherent in all contracts and ensures that parties do not frustrate the fruits of the bargain by acting arbitrarily or unreasonably." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (cleaned up). "The covenant of good faith and fair dealing embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract." *Id.* (internal quotation marks omitted). Courts utilize the implied covenant "to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated, and courts will invoke the

---

[228] Pl.'s Opening Br. 33.

implied covenant to imply terms when necessary to protect the reasonable expectations of the parties." *Id.* (cleaned up). This court in particular must be careful when considering a plea to invoke the implied covenant. Although this is a court of equity, this court may not use the implied covenant as "an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Id.* at 1116–17.

To prevail on an implied covenant claim, a plaintiff must prove a "specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). The party asserting an implied covenant claim has the burden of proving "that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Baldwin*, 283 A.3d at 1118. In determining the parties' reasonable expectations, the court analyzes "whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose." *Id.*

### 1. Sellers breached the implied covenant of good faith and fair dealing by acting in bad faith to thwart Plaintiff's rights.

When determining whether to invoke the implied covenant, the court "first must engage in the process of contract construction to determine whether there is a

gap that needs to be filled." *Allen v. El Paso Pipeline GP Co., LLC*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, --- A.3d ----, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE). "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2024). The court must determine whether a gap exists "because the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

Under Delaware law, a party may breach the implied covenant by taking action in bad faith; in other words, a party may breach the implied covenant by acting maliciously in an effort to harm its contractual counterparty. *See Baldwin*, 283 A.3d at 1119. The purported "gap" to be filled in such scenario is an agreement not to intentionally harm each other. The court in *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975 (Del. Ch. 2023), explained:

> For purposes of the implied covenant, . . . in the original bargaining position, the parties would have viewed a promise not to harm each other intentionally as so obvious that neither side would have raised it. It also means that if one side suggested that intentional harm would be

55

acceptable, then the other would reject that idea immediately. Absent an idiosyncratic taste for masochism, the rational response to the question "After we enter into this contract, can I intentionally seek to harm you?" is a resounding "No."

*Id.* at 1005; *see also id.* at 1005–06 (concluding that seller pled facts and introduced evidence that supported a claim for breach of the implied covenant where purchaser's adjustments to the balance sheet, which resulted in a significantly lower purchase price, were so extreme as to indicate malice but deferring consideration of such claim until parties submitted dispute to independent accountant as provided in the purchase agreement).

Plaintiff argues that the gap to be filled in the Settlement Agreement and Side Letter is one of "[s]imple fairness."[229] Plaintiff contends that the Sellers had an "implied obligation to treat IRP fairly throughout the Sale Process," and that the Sellers failed to do so.[230] Sellers argue that they were not impliedly required to treat IIF or the Plaintiff "fairly" in the auction because "[t]he Process Letter did not give any bidder a right to be treated 'fairly'" and "bidders could be kicked out of the process at any time and for any reason."[231] However, other bidders were not parties to the Settlement Agreement and Side Letter, as the Plaintiff was here. The Side Letter specifically provided IIF and IRP with unique rights during the Sale Process,

---

[229] Pl.'s Opening Br. 35.

[230] *Id.*

[231] Seller Defs.' Answering Br. 38.

including the right for IIF to "not be eliminated from the Current Sale Process at any time prior to the receipt of the last bid permitted to be submitted within the Current Sale Process."[232] IIF and IRP's rights under the Settlement Agreement and Side Letter also carried with them an obligation that the Sellers "do not frustrate the fruits of the bargain by acting arbitrarily or unreasonably." *Baldwin*, 283 A.3d at 1116 (cleaned up).

Plaintiff argues that the Sellers failed to treat IIF and IRP fairly throughout the Sale Process in various ways. *First*, Plaintiff argues that Sellers never intended to sell RailUSA to IIF because Sellers "harbored significant animus towards Marino and IRP."[233] *Second*, Plaintiff argues that Wilson disclosed confidential details about the Sale Process and IIF's bid to Macquarie and coached Macquarie to craft a winning bid.[234] *Third*, Plaintiff argues that Wilson lied about the risk of RailUSA executives quitting pre-closing to manufacture fake "closing risk" associated with IIF.[235] *Last*, Plaintiff argues the execution of the Expense Reimbursement put IIF's bid at a clear disadvantage and incentivized a sale to Macquarie.[236] Sellers dispute

---

[232] Side Letter at 1.

[233] Pl.'s Opening Br. 36.

[234] *Id.* at 38.

[235] *Id.* at 42.

[236] *Id.* at 37.

each of Plaintiff's arguments.  The court analyzes each in turn to determine whether Sellers acted maliciously in an effort to harm the Plaintiff.

*First*, the Sellers maintain that "their goal in the auction was to 'maximize value,' consistent with their fiduciary duties" and that they "took IIF seriously until the end."[237]  Sellers argue there was no implied covenant obligation for them to "like bidders equally."[238]  The court agrees.  Even assuming *arguendo* that the Sellers were averse to selling to IIF, the Sellers did not intentionally harm Plaintiff by treating other bidders, namely Macquarie, more favorably.  *See ArchKey*, 302 A.3d at 1005 ("[T]he intent to harm intentionally—malice—goes beyond an intent to take self-interested action that happens to inflict consequential or collateral harm.").

*Second*, the Sellers refute the Plaintiff's allegation that Wilson disclosed the price of any of IIF's active bids.[239]  Wilson testified that she did not disclose any of IIF's active bids to Macquarie; Plaintiff nevertheless argues that the court should infer Wilson's disclosure of the $223 million bid from other evidence.[240]  Based on

---

[237] Seller Defs.' Answering Br. 40–41.

[238] *Id.* at 40.

[239] *Id.* at 43.

[240] Pl.'s Opening Br. 40–42.

the record, the court finds that Wilson disclosed only IIF's stale bids.[241]  Plaintiff

was not intentionally harmed by Wilson disclosing stale bids.

*Third*, Sellers claim the closing risk associated with executive departures was

not manufactured.[242]  Wilson testified that two RailUSA employees told her they

would not work for IRP, and that she inferred the same intent from other employees'

prior comments about IRP and other factors.[243]  Even assuming that Wilson

"manufactured" closing risk, this purported intentional harm is unrelated to the

purpose of the underlying contract—the Side Letter—and does not constitute a

---

[241] Tr. 528:14–24 (Wilson) ("Q.  And the bid that you testified that you disclosed to Macquarie was IIF's November 9th, 2021, $212 million final offer; correct?  A.  It was the bid submitted on November 9th for $212 million, correct.  Q.  So to be clear, on November 13th, 2021, you informed Macquarie that IIF had bid $212 million in the auction.  Correct?  A.  That the stale bid that was a prior round of the auction was indeed discussed as $212 million."); JX 471 at 64:16–21 (Wilson Dep.) ("Q.  Did RailUSA communicate any information about that bid to Macquarie?  . . .  A. To the best of my knowledge, after it was a stale bid, I may have communicated something about that bid to Macquarie.").

[242] Seller Defs.' Answering Br. 44–47.

[243] Tr. 484:6–16 (Wilson) ("I had a conversation with [] Quick from Oaktree where he asked me about what I thought would happen with members of the management team.  I was able to tell him that two members of the management team had said definitively to me that they would not work for IRP.  That was Trevor Costilow, the general manager at Grenada Railroad, and Patricia Bencivenga, our CFO."); JX 384 at 19:20–20:5 (Costilow Dep.) ("Q.  If IRP had become manager of RailUSA again, would you have left RailUSA?  A.  Yes, sir.  Q.  Did you state to anyone that you would resign if RailUSA was sold to a buyer that would reinstate IRP as the manager?  A.  Yes, sir.  Q.  Who did you tell?  A.  Barbara Wilson.  Q.  Anyone else?  A.  Patricia Bencivenga.").  Wilson's credibility regarding this point is questionable.  *See, e.g.*, JX 383 at 21:6–13 (Bencivenga Dep.) ("Q.  Did you state to anyone that you would resign if RailUSA was sold to a buyer that would reinstate IRP as the manager?  A.  I do not recall.  Q.  Did any RailUSA employees tell you that they would resign if RailUSA was sold to a buyer that would reinstate IRP as manager?  A.  I don't recall.").  However, the court's conclusion is the same regardless.

breach of the implied covenant. *See ArchKey*, 302 A.3d at 1003–04 ("An implied covenant claim . . . is not a free-floating duty unattached to the underlying legal document. . . . Fair dealing in this context means an obligation to deal fairly in the sense of consistently with the terms of the parties' agreement and its purpose. . . . [G]ood faith does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract." (citations and internal quotation marks omitted)).

*Last*, the Sellers claim that the failure to disclose the Expense Reimbursement does not constitute a breach of the implied covenant because "price disclosure" is covered by the express terms of the contract.[244] The Side Letter addresses the Sellers' obligation to disclose the "then-highest final" bid if IIF were *not* the highest bidder. It does not affirmatively address the Sellers' obligation to disclose terms counted *against* IIF's own bid. Sellers' failure to disclose the Expense Reimbursement is not covered by the express terms of the contract.

Sellers then argue that they fought back on the Expense Reimbursement and were not "driven by an improper purpose" to favor Macquarie.[245] However, the Sellers' execution of the Expense Reimbursement, and their motivations for entering into it, are not the problem—the problem is the Sellers' failure to disclose the amount

---

[244] Seller Defs.' Answering Br. 41.

[245] *Id.* at 42.

the Expense Reimbursement would be counted against IIF's bid. *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *7 (Del. Ch. Aug. 26, 2005) (explaining that a contract requiring disclosure of information carries with it "the duty that such information not be false or misleading" and the party with the disclosure obligation "ha[s] a contractual duty to provide the information in good faith"). The purpose of the Side Letter was to give IIF an opportunity to top the "then-highest final" bid. If the Plaintiff had a right to top the price of the then-highest bid, it surely also had a right to know that its own bid price was going to be reduced by $2.5 million. Sellers' decision not to disclose that the Expense Reimbursement counted against IIF's bid deprived IIF and IRP of the fruits of their bargain, constituting a breach of the implied covenant of good faith and fair dealing.

## C. Damages

Having concluded that the Plaintiff has proven breach, the court turns next to the issue of damages. "To satisfy the final element [of a breach of contract claim], a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *32 (Del. Ch. Oct. 4, 2013). "While a plaintiff must prove the fact of damages by a preponderance of the evidence, the proof required to establish the amount of damage is not as great as that required to establish the fact of damage." *AbbVie Endocrine*

61

*Inc. v. Takeda Pharm. Co. Ltd.*, 2023 WL 5704055, at *3 (Del. Ch. Sept. 5, 2023) (emphasis and internal quotation marks omitted).

Under Delaware law, the general measure of damages for breach of contract is based on the injured party's expectation interest. *Duncan v. Theratx*, 775 A.2d 1019, 1022 (Del. 2001). Expectation damages "are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009).

> When determining expectation damages, courts determine an amount that will give the injured party the benefit of its bargain by putting that party in the position it would have been but for the breach. The primary element of expectation damages is the value that the performance would have had to the injured party, or the loss in value caused by the deficient performance compared to what had been expected.

*Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019) (footnote and internal quotation marks omitted). However, "when acting as the fact finder, this Court may not set damages based on mere speculation or conjecture where a plaintiff fails to adequately prove damages." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (internal quotation marks omitted), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

Plaintiff's damages theory is based upon numerous assumptions. At bottom, it assumes that, but for Defendants' breach of the Settlement Agreement and Side Letter: (1) IIF would have acquired RailUSA; (2) IRP would have derived profits

from IIF's acquisition of RailUSA through a contractual relationship with IIF; and (3) RailUSA would have performed to certain projected levels.[246] Defendants maintain that the Plaintiff did not prove that any of these assumptions had or would have come to fruition.[247] The court focuses on the first and second assumptions because they are dispositive.

### 1. Plaintiff did not prove that it was more probable than not that IIF would have acquired RailUSA absent the breach.

IRP insists that it would have "won the auction" had the Defendants not breached.[248] According to IRP, absent the Defendants' breach, the Defendants would have disclosed the "true price" of Macquarie's November 9 bid as $225.6 million—$221.8 million base purchase price, plus the (i) $2.5 million Expense

---

[246] Pl.'s Opening Br. 51–57. These three categories essentially condense several assumptions. *See* Seller Defs.' Answering Br. 47–48 (detailing the list of contingencies that Plaintiff and Plaintiff's witness agreed would need to be met in order for IRP to recover any damages, such as "IIF would have to win the auction; IIF and sellers would have to negotiate and sign a purchase and sale agreement; IRP and IIF would have to form a [binding] partnership . . . unlike what they had; IRP and IIF would have to negotiate and sign the master services agreement; IIF would have to approve the capital expenditures necessary to pursue the initiatives; IIF would have to agree that the initiatives not already listed as qualifying on the table actually did qualify; IRP would have to, within that 12-month time requirement, meet the necessary threshold for qualification of the EBITDA initiatives; IRP would then have to successfully operate and generate EBTIDA from the initiatives within whatever IIF viewed as the qualifying time period; and the hypothetical Holdco board controlled by IIF would have to review the EBITDA initiative status, contribution achieved, and decide whether or not to award IRP additional equity" (emphasis and internal quotation marks omitted)).

[247] Seller Defs.' Answering Br. 51–53.

[248] Pl.'s Opening Br. 46.

Reimbursement and (ii) $1.3 million carve-out for the Sellers retaining the proceeds from the Insurance Claim.[249]  Then, IIF would have beaten Macquarie's $225.6 million bid, and the Sellers would have ended the auction and declared IIF the winner.[250]  This argument is flawed and unconvincing.

*First*, the Settlement Agreement and Side Letter did not obligate Sellers to declare IIF the winning bidder merely because its bid price was the highest bid.  IRP tried to obtain that right in the settlement negotiations but was unsuccessful.[251]  So even if IIF's bid was higher than Macquarie's bid, IIF could not have been assured of prevailing.  *Second*, it is not apparent to the court that IIF would have topped Macquarie's "true price" of $225.6 million or that it could have done so by a

---

[249] *Id*. at 30.

[250] *Id.* at 33.

[251] *Compare* JX 139 (Settlement negotiations regarding "proposed topping bid term"), *with* JX 140 (final Settlement Agreement with no topping bid term), *and* JX 141(final Side Letter with no topping bid term); Tr. 267:13–268:2 (Ventrcek) ("Q.  During the course of negotiations by your company . . . IRP wanted, and tried to get, a provision requiring the seller to accept IRP's bidding partner's bid as long as it submitted a topping bid; right?  A. Correct.  Q.  While IRP tried to get that guarantee, the fact is it was not successful . . . There is no such guarantee; right?  A.  Right."); *id.* at 616:7–11 (Quick) ("Q.  To your understanding, does this side letter obligate the sellers to accept any bid that IIF might submit?  A.  No.  That was requested multiple times and denied.  And this letter says nothing to the sort.").

significant amount. The court reaches this conclusion based upon the following review of the record.[252]

The maximum amount that IIF was authorized to bid, and "the maximum . . . [IIF was] willing to pay," was $225 million.[253] Li was clear that he "didn't want to pay the full $225 million" that was authorized, because he needed a "cushion" to account for other elements of value and IIF's "additional closing expenses."[254] Plaintiff is correct that when IIF made its final $224 million bid, IIF had also agreed to the $1.3 million carve-out for the Insurance Claim,[255] as had Macquarie. Thus, under the Plaintiff's damages formulation, and taking into account that both IIF and Macquarie had agreed to the insurance carve-out, the value of IIF's bid was $225.3 million, and the value of Macquarie's bid was $225.6 million. Based on the record, it is not apparent to the court that IIF would have gone any higher than its final bid. Even if IIF were inclined to do so, the court concludes it would have only

---

[252] The court sat through the trial and reviewed the entire evidentiary record. Merely because the court did not cite a specific exhibit or witness testimony in this opinion does not mean that the court failed to consider the entire evidentiary record.

[253] JX 254 at 1; JX 482 at 28:15–29:23 (Lequin Dep.); JX 391 at 136:19–140:14, 202:13–203:2 (Li Dep.). Clara Lequin is an executive director at J.P. Morgan who worked with Li during the Sale Process. JX 482 at 8:23–9:5, 12:19–24 (Lequin Dep.)

[254] JX 391 at 137:14–138:18, 140:9–14 (Li Dep.).

[255] JX 343 ("Regarding purchase price, [IIF is] not going to come up to $225mm, but [is] likely to accept a few more items being excluded from debt that should have similar impact (at a minimum insurance financing and Blue Chip RWI claim reimbursement).").

been a marginal increase and not enough to significantly exceed the value of Macquarie's last bid.

Sellers also identified potential closing risks associated with IIF's bid. On that score, the Sellers considered Macquarie's bid "better on other materially important terms, including retention and management issues and . . . execution and closing risk."[256] Plaintiff persuasively showed that some of these identified risks were pretextual, such as concerns about Marino attempting to "raise last minute issues that could jeopardize the transaction"[257] and mass employee departures.[258] On the other hand, IIF had a documented track record of false starts when inquiring

---

[256] JX 346 at 1.

[257] JX 294 at 2. Marino was not the bidder in the Sale Process, IIF was. Although Marino had a history of attempting to renegotiate deals after he had reached an agreement in principle with a contractual counterparty, he was contractually bound not to interfere in the Sale Process. JX 389 at 163:18–165:8 (Quick Dep.); Tr. 498:8–499:5 (Wilson); *id.* at 815:15–20, 829:15–830:19 (Harwood); *id.* at 636:18–638:8 (Quick); JX 383 at 28:2–7 (Bencivenga Dep.); JX 389 at 137:23–138:9 (Quick Dep.); Settlement Agreement at 2. There is no evidence that Marino attempted to interfere.

[258] The Special Committee claimed concern that several RailUSA employees might quit pre-closing if IIF won the auction. JX 294 at 2. Yet, the Special Committee did no independent investigation and conducted no employee interviews. Tr. 856:3–10 (Harwood). Rather, they relied on Wilson. *Id.* at 649:19–23 (Quick); *id.* at 855:13–856:18 (Harwood). Sellers accepted Wilson's representations about potential employee departures without critically assessing her obvious distaste for Marino and her motivation to remain as RailUSA's CEO under Macquarie. Sellers had been at daggers drawn with Marino for years, so it is not surprising that they accepted Wilson's representations without making further inquiry. As it turns out, Wilson did not even speak to five of the seven employees "at risk" of quitting. *See* JX 386 at 22:7–21 (Dull Dep.); JX 385 at 22:14–21 (Cucci Dep.); JX 383 at 21:6–17 (Bencivenga Dep.); JX 387 at 212:2–215:18 (Wilson Dep.); Tr. 544:22–545:3 (Wilson). And the one employee who had quit did so for reasons not specific to IIF. Tr. 857:1–9 (Harwood).

about purchasing RailUSA on several prior occasions.[259]  And although IIF had communicated that it had no further diligence inquiries and was prepared to close immediately,[260] its submission of "high priority" diligence requests to Northborne as late as November 20, 2021, indicated otherwise.[261]

### 2. Plaintiff did not prove that it was more probable than not that IIF would have partnered with IRP on the terms it has presented.

At trial, the Plaintiff proceeded as though its damages should be measured by what it would have received under the March 2022 MOU with IIF had RailUSA performed as IRP and its experts projected.[262]  But as the Defendants convincingly showed, the March 2022 MOU was a litigation-driven document that was created months after the breaching conduct in November 2021, undermining the Plaintiff's original theory of damages.  *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132–33 (Del. 2015) ("[T]he standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach"  (internal quotation marks omitted)); *Comrie v. Enterasys Networks, Inc.*,

---

[259] Tr. 617:3–618:20, 620:19–621:5 (Quick); JX 470 at 43:17–23 (Kruse Dep.).  Jordon Kruse is a managing director at Oaktree.  JX 470 at 12:4–16 (Kruse Dep.)

[260] Tr. 591:2–18 (Li).

[261] JX 334 at 1 (emphasis omitted).

[262] JX 462 at 320:12–16 (Bastone Dep.) ("Q.  [I]s IRP's damages theory based on the executed March 2022 MOU or the draft November 9, 2021 MOU?  A.  The March [2022] MOU."); *see* JX 500 (Lesovitz expert report) (assessing damages using the March 2022 MOU); JX 501 (Sussman expert report) (same).

837 A.2d 1, 17 (Del. Ch. 2003) (observing that "[d]amages are to be measured as of the time of the breach"); *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *19 (Del. Ch. Sept. 19, 2017) (explaining that contract damages are determined by "expectations of the parties before or at the time of the breach" (internal quotation marks omitted)), *aff'd*, 188 A.3d 824 (Del. 2018) (TABLE). Indeed, the Plaintiff essentially concedes that the March 2022 MOU was executed to give IRP a basis to present a damages case.[263]

Plaintiff then pivoted after trial, insisting IIF and IRP had "finalized a partnership" in November 2021.[264] Plaintiff even backtracked from that position in its post-trial reply brief, claiming only that IIF and IRP had "finalized the *framework* for their partnership as of November 9, 2021."[265] Neither position is credible,

---

[263] Tr. 54:5–9 (Bastone) ("Q. Right. And you spoke to [] Li and you said, we need an MOU to include with our amended complaint in this case? A. Correct. As per conversations with our attorneys."); *id.* at 386:7–11 (Marino) (agreeing that "one of the purposes" of the March 2022 MOU was "to bring certainty to the damages claim"); *id.* at 585:19–21 (Li) ("Q. Was the pending litigation one of the reasons why you executed the MOU in March? A. Yes.").

[264] Pl.'s Opening Br. 8.

[265] *Compare id.* (arguing that IIF and IRP had "finalized a partnership"), *with* Pl.'s Reply Br. 18 (arguing that IIF and IRP had "finalized the *framework* for their partnership as of November 9, 2021" (emphasis added)).

because even their principals understood that they "did not have a partnership" at that time or even as of trial.[266]

In the face of its own admission that it did not have a formal partnership with IIF in November 2021, Plaintiff nevertheless argues that its damages should be measured by what it would have received under the terms of the November 2021 MOU with IIF had RailUSA performed as IRP and its experts projected. Defendants, unsurprisingly, contend that the Plaintiff cannot demonstrate the fact of damages because the unsigned, redline draft November 2021 MOU was indefinite and speculative. Having considered the terms of the November 2021 MOU itself and the circumstances surrounding its drafting, the court agrees with the Defendants' position.

The genesis of the November 2021 MOU was IRP's execution of the Side Letter on October 12, 2021. After executing the Side Letter, Marino told IIF that he had secured "an absolute right to submit the final bid and be the winning bidder for the transaction."[267] That statement was not accurate.[268] In any event, up until that

---

[266] Tr. 560:5–7 (Li) ("First of all, we didn't have a -- at that point [November 18, 2021] we didn't have a partnership. We still don't."); JX 394 at 27:8–11 (Marino Dep.) ("Q. You actually, even today, don't have any sort of formal partnership with IIF, right? A. That's correct.").

[267] JX 391 at 79:3–9 (Li Dep.).

[268] When Li saw the language in the Side Letter on November 1, he learned that IIF actually did not have "the right to top absolutely." JX 195 at 1. As Lequin aptly put it: "[I]t's all

69

time, IIF was "[n]ot actively considering" partnering with IRP.[269]  In October 2021, IIF and IRP began negotiating the terms of an MOU to govern a possible partnership.[270]

On November 8, 2021, IIF sought approval from its investment committee to bid on RailUSA.[271]  The investment committee presentation indicated that IIF's "base case" was "that there's no change to the management teams."[272]  The deal team also included an alternative plan "to hire an interim management team" with *non*-IRP executive Mike Cory as "a strong interim CEO candidate."[273]  The presentation did not reference a partnership with IRP, the November 2021 MOU, a topping bid right, or an ownership structure in which IIF owned anything less than 100% of RailUSA.[274]  Although Li claims he raised the "possibility of [IRP] participating in equity ownership," this scenario did not make it into the presentation,

---

Gary really got for us. . . ." *Id.*  While IIF negotiated the draft November 2021 MOU over the next week, the deal team was privately dismissive, saying that the MOU was "absurd," negotiations were "not good," and the proposed partnership was "effectively robbery" that "would bring so little upside."  JX 213 at 3–4; JX 222 at 3.

[269] JX 391 at 78:3–8 (Li Dep.).

[270] *Id.* at 81:24–82:5 (Li Dep.).

[271] JX 216.

[272] Tr. 559:9–560:1 (Li).

[273] JX 216 at 14.  Cory was the former Chief Operating Officer of Canadian National Railway.  *Id.*

[274] *Id.*

no terms were discussed, and he did not secure approval to sign the current draft of the November 2021 MOU.[275]

The following day, on November 9, the November 2021 MOU was exchanged for the last time—in redline—and IIF and IRP went pencils-down.[276] The November 2021 MOU was expressly non-binding and contingent on investment committee and board approval for IIF, which IIF never obtained.[277] The redline indicated that IIF would own 90% of the equity in the holding company and IRP would own 10%.[278] But Bastone admitted that other material terms remained undecided.[279] This is reflected in the redline document, which leaves material economic terms blank or bracketed, including IRP's capital contribution for additional equity in the parties' joint venture, Railroad Holdco, the amount of equity IRP could be awarded, and the "Qualifying EBITDA Initiatives" by which IRP could increase its equity stake.[280]

---

[275] Tr. 562:5–10, 565:17–566:8 (Li).

[276] JX 237; Tr. 50:2–22 (Bastone); *id.* at 584:1–11 (Li).

[277] JX 237 at 2; Tr. 565:17–566:16 (Li).

[278] JX 237 at 2.

[279] Tr. 78:4–16 (Bastone); ("Q. You hadn't agreed to the percentage of equity that you could purchase or the purchase price; right? A. Right. Q. And that was pretty material? A. Again, it's material to us. Is it material to getting a deal done? No. . . ."); *id.* at 56:18–57:5 (Bastone); *see id.* at 575:13–576:1 (Li). Notably, the November 2021 MOU characterized the scope of IRP's management services as an "open item." JX 237 at 4.

[280] JX 237 at 1, 9. The record also contains a "clean copy of the IIF MOU" that was circulated at 4:49 p.m. on November 9. JX 236. This document, too, is unsigned and contains blanks and brackets for dates and material economic terms. *Compare* JX 236 at 1, 4, 8–9, *with* JX 237 at 1, 9. It is apparent to the court that this document is just a "clean" version of the redline document that was circulated earlier that afternoon.

The unsigned, non-binding, incomplete redline draft of the November 2021 MOU and the evidence surrounding its drafting and negotiation demonstrate that IRP's supposed harm resulting from the breach of the Settlement Agreement and Side Letter was "uncertain, contingent, conjectural [and] speculative." *Pharmathene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *11 (Del. Ch. Nov. 23, 2011). Contrary to IRP's position, the court is not persuaded IIF and IRP had "finalized a partnership" or even "finalized the framework" for a partnership. Marino's history of renegotiating deals further undermines the notion that IIF and IRP had reached an agreement.[281] The fact that IIF and IRP did nothing further until months later, after the court had indicated at the preliminary injunction stage that IRP established a reasonable probability of success in establishing breach, is also

---

[281] JX 389 at 163:18–165:8 (Quick Dep.) ("Q. And can you expand a little bit on your concerns with potential re-trading by [IIF] and IRP? A. Yeah. Historically, I think [Marino] had a reputation of starting the negotiation once the contract is signed. . . . Q. [W]ere you concerned that Gary Marino and IIF or JP [Morgan] were going to engage in similar re-trading in connection with a - - the sales process even if [IIF's] bid was accepted? A. Yes. . . . Things will come up and you'll need to get approval from the buyer to make certain decisions . . . the context of bringing those to [IIF] . . . would cause me a lot of concerns, that they would be viewed as an open door to re-trade other points in the agreement besides just the general experience of subtle points being attempted to be re-traded in the -- in the litigation Settlement Agreement."); Tr. 815:15–20 (Harwood) ("Q. What was the re-trade? Who initiated the re-trade? A. IRP initiated a re-trade. We had a settlement agreement in principle, and then IRP made a litany of other requests that all had to do with the auction process."); *id.* at 829:15–830:19 (Harwood); *id.* at 636:18–638:8 (Quick); JX 383 at 28:2–7 (Bencivenga Dep.); JX 389 at 137:23–138:9 (Quick Dep.).

noteworthy.[282]  If the parties had reached a partnership in November, there was no need to go pencils down on November 9, let alone to subsequently enter into an agreement months later.  For IIF and IRP to have stopped negotiations at that time and then to execute a different, made-for-litigation MOU four months later (*i.e.*, the March 2022 MOU), inspires no confidence that the November 2021 MOU reflected terms of a "partnership" that supports IRP's claim that it suffered damages from the breach of the Settlement Agreement and Side Letter.

Accordingly, the court concludes that the Plaintiff has failed to prove its fact of damages by a preponderance of the evidence.

## III.   CONCLUSION

In conclusion, judgment shall be entered in favor of the Defendants.  The parties are directed to submit an implementing order within ten business days of the date of this opinion.

---

[282] Plaintiff's assertion that Li did not need further approval to sign an MOU with IRP based upon the November 2021 MOU terms is not credible.  Plaintiff points to no contemporaneous document supporting that position.  Instead, it is apparent to the court that the IIF-IRP deal would be driven by the final acquisition terms.  As Li explained, IIF was not going to finalize a MOU with IRP "until [IIF] came to the view that [it] would be the owners of RailUSA." Tr. 577:22–578:1 (Li).  This indicates that the terms of the "partnership" between IIF and IRP would not be determined until after IIF had won the auction and knew the precise terms of its contract with the Sellers.  The views of IIF executives that Marino had oversold the benefits of the Settlement Agreement and Side Letter suggest that IIF was not wedded to the terms of the draft November 2021 MOU. *See* JX 213; JX 222.